Krupp, Peter B., J.
Plaintiffs Anne Entwistle (“Anne”) and Erik Entwistle (“Erik”) (together, “the Entwistles”) lost personal property in a fire at a family-owned home in Vermont. Because the insurance on that home was insufficient to cover the loss, the Entwistles filed a claim under two other homeowner policies, one with defendant Safety Indemnity Insurance Company (“Safety”), which insured their princi *562 pal residence in Cambridge, and the other with defendant York Insurance Company of Maine (“York”), which insured their newly purchased vacation home in New Hampshire. The Entwistles filed this action challenging both defendants’ application of the 10% sub-limit provisions in their respective policies, substantially limiting the Entwistles’ recovery. The case is before me on cross motions for summary judgment. For the following reasons, the Entwistles’ motion is DENIED, York’s motion is ALLOWED, and Safety’s motion is ALLOWED in part and DENIED in part.[4]
BACKGROUND
I briefly summarize the facts in the light most favorable to the non-moving party, see Foster v. Group Health, Inc., 444 Mass. 668, 672 (2005), and reserve other facts for the discussion, including the relevant provisions of the insurance policies in question.
The Entwistles are married and live at 61 Larch-wood Drive, Cambridge, Massachusetts (“the Cambridge house”). The Entwistles are registered to vote in Cambridge, their children attend school in Cambridge, they pay taxes in Massachusetts, and Erik works in Cambridge. Safety issued a homeowners policy on the Cambridge house for the period of January 16, 2011 through January 16, 2012 (“the Safety policy”).[5]
Anne’s parents owned a house in Peru, Vermont (“the Vermont house”), which they conveyed to the Lewis D. de Schweinitz Revocable Trust (“the LDS Trust”) in 1997 around the time they moved to Florida. Anne’s sister was the trustee of the LDS Trust. Anne’s father died in 1998, and Anne’s mother remained in Florida. Starting in early 2004, the LDS Trust listed the Vermont house for vacation rental.[6] The Entwistles used the Vermont house as a vacation home during school vacations and holidays when it was not rented.
Anne’s mother created the Elizabeth H. de Schweinitz Revocable Trust (“the EHS Trust”) in 1996, naming herself as trustee. In 2009, Anne’s mother conveyed personal properly to the EHS Trust, resigned as trustee, and appointed Anne as trustee in her place. The personal properly transferred to the EHS Trust was all of Anne’s mother’s personal property, including silver, antiques and artwork located in Naples, Florida, in the Vermont house, and in Cambridge, Massachusetts. As trustee of the EHS Trust, Anne was required to distribute the personal properly after her mother’s death. Anne’s mother died in November 2010. Anne and her two siblings were the beneficiaries of the LDS Trust.
After cleaning and fixing up the Vermont house, the LDS Trust listed the Vermont house for sale on March 24, 2011. In late March or early April 2011, the Entwistles staged the Vermont house for prospective buyers. They packed up the belongings they had at the Vermont house and stored them in the house’s closets and storage areas. The Vermont house remained “essentially vacant” after the Entwistles completed the staging.
On April 26, 2011, the Entwistles purchased a house in Fitzwilliam, New Hampshire (“the New Hampshire house”), primarily because the Vermont house was for sale. York issued a homeowners policy to the Entwistles for the New Hampshire house for the period of April 26, 2011 through April 26, 2012 (“the York policy”). The Entwistles intended to move their belongings from the Vermont house to the New Hampshire house after the work on the New Hampshire house was completed.[7]
The Entwistles and other family members stayed at the Vermont house for a weekend in May 2011. Anne brought with her the EHS Trust properly she kept in the Cambridge house and arranged for family members to view it in anticipation of distributing the property. Anne then left the items at the Vermont house, in a locked storage shed over the garage.
On June 21, 2011, a fire at the Vermont house severely damaged the house and its contents. The insurer of the Vermont house paid the full policy limit, which was far less than the loss.
The Entwistles sought coverage for the loss of personal property under their Safety and York policies. York responded that the 10% sub-limit provision in the York policy applied to limit the Entwistles’ recovery and paid the Entwistles $33,880.00, which was 10% of the personal property coverage under that policy. Safety also responded that the 10% sub-limit provision in its policy applied to limit the Entwistles’ recovery. Safely offered to pay the Entwistles pursuant to the 10% sub-limit, provided the Entwistles signed a release of their claim for any coverage beyond the 10% sub-limit. The Entwistles did not sign the release.
The Entwistles usefully divide the property they claim to have lost in the fire into the following four analytically distinct categories.[8]
1. EHS Trust Property Usually Located in Cambridge
Some of the personal properly that Anne’s mother conveyed to the EHS Trust in 2009 was usually located at the Cambridge house. The Entwistles brought this property with them from the Cambridge house when they stayed at the Vermont house in May 2011. Anne left this personal properly in the locked storage area over the Vermont house’s garage. At oral argument, Safety conceded that the 10% sub-limit in its policy does not apply to the personal property in this category. The Entwistles agree York’s 10% sub-limit does apply to this property.
2. EHS Trust Properly Used or Stored in Vermont
Some of the personal properly that Anne’s mother conveyed to the EHS Trust in 2009 was usually located at the Vermont house. The family used some of this property to furnish the Vermont house. The family stored the rest of the property in the locked storage area over the Vermont house’s garage.
*563 3. The Entwistles’ Jointly Owned Personal Property
The Entwistles kept at the Vermont house personal property that they bought or received as gifts. Before the Vermont house was listed for sale, renters and family members used this personal property during visits. Some was also located in the locked storage area over the Vermont house’s garage. At the time of the fire, all of this personal property was stored in closets in the Vermont house, in the Vermont house’s garage, and in the locked storage area over the garage.
4. Erik’s Inherited Property
Erik kept at the Vermont house personal property that he inherited from his father. A few of these items furnished the Vermont house. Erik stored the rest of this personal property in storage areas throughout the Vermont house.
DISCUSSION
Summary judgment is granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 808-09 (1991); Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989); see Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
The court considers the evidence presented in the light most favorable to the non-moving party. Mass.R.Civ.P. 56(c); Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991); Flynn v. Boston, 59 Mass.App.Ct. 490, 491 (2003). The non-moving party, however, cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). “[B]are assertions and conclusions ... are not enough to withstand a well-pleaded motion for summaryjudgment.” Polaroid Corp. v. Rollins Envtl. Servs., Inc., 416 Mass. 684, 696 (1993).
I. The Relevant Policy Language
The relevant language in the Safety and York policies is virtually identical.
A. The Safety Policy
The Safety policy insured the Cambridge house at the time of the house fire in Vermont. The declarations page identifies the Cambridge house as “the residence premises covered by this policy.” The Safety policy defines “residence premises” as “a. The one-family dwelling, other structures, and grounds; or b. That part of any other building; where you reside and which is shown as the ‘residence premises’ in the Declarations.” Under the Safety policy, Coverage C addresses coverage for personal property. It sets a personal property liability limit of $438,984, which is 70% of the $627,120 coverage limit for the dwelling. The Safety policy states that Safety “insure[s] for direct physical loss [to personal property] caused by . . . [f]ire.” (Bold omitted.) The Safety policy “cover[s] personal property owned or used by an ‘insured’ while it is anywhere in the world.” It states, however: “Our [Safety’s] limit of liability for personal property usually located at an ‘insured’s’ residence other than the ‘residence premises,’ is 10% of the limit of liability for Coverage C, or $1,000, whichever is greater.”
B. The York Policy
The York policy insured the New Hampshire house at the time of the house fire in Vermont. The declarations page describes the New Hampshire house as the “residence premises.” The York policy defines “residence premises” as “[t]he one family dwelling where you reside . . . and which is shown as the ‘residence premises’ in the Declarations.” In the York policy, Coverage C addresses coverage for personal property. It sets a personal property liability limit of $338,800, which is 70% of the $484,000 coverage limit for the dwelling. The York policy states that York “insure[s] for direct physical loss [to personal properly] caused by . . . [fjire.” (Bold omitted.) The York policy “cover[s] personal property owned or used by an ’’insured’ while it is anywhere in the world." Under a heading entitled “Limit for Property at Other Residences,” the York policy states: “Our [York’s] limit of liability for personal property usually located at an ‘insured’s’ residence, other than the ‘residence premises,’ is 10% of the limit of liability for Coverage C, or $1,000, whichever is greater.”
II. Interpretation of the Policies
There is no dispute that the Entwistles owned the personal property destroyed in the fire and that the personal property at issue was not located at, and was not “usually located” at, the “residence premises” (i.e. either the Cambridge house or the New Hampshire house) when it was lost.[9] The question here is whether under one, both or neither of the policies was the personal property that was lost “usually located at an ‘insured’s’ residence, other than the ‘residence premises.’ ” (Emphasis added.) If so, the 10% sub-limit applies. If not, the Entwistles would be entitled to payment for their loss up to the full extent of the personal property coverage under each policy.
As an initial matter, Anne had an interest in the Vermont house at the time of the fire as a beneficiary of the LDS Trust which owned the Vermont house. The Vermont house is therefore an “insured’s” under both of the policies. The only remaining question is whether the Vermont house is an “ ‘insured’s’ residence.’’ (Emphasis added.) Neither the Safety policy nor the York policy defines this phrase. The Entwistles argue, and Safety and York dispute, that the court must narrowly construe the term “residence” to mean a place where *564 the insured was actually living at the time of the loss.[10]
A. The Safety Policy
Under Massachusetts law, “(i]nterpretation of an insurance policy is a question of law to be determined by the court.” Golchin v. Liberty Mut Ins. Co., 466 Mass. 156, 159 (2013). The court must “interpret all words in their usual and ordinary sense, and construe policies as a whole, without according special emphasis to any particular part over another.” Surabian Realty Co., Inc. v. NGM, Ins. Co., 462 Mass. 715, 718 (2012). See Bagley v. Monticello Ins. Co., 430 Mass. 454, 457 (1999) (“[w]ords in exclusionary clauses of insurance contracts should be construed ‘in their usual and ordinary sense’ ”}. “Every word . . . must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable.” Deutsche Bank Nat'l Ass’n v. First Am. Title Ins. Co., 465 Mass. 741, 748 (2013) (ellipses in original) (citations and internal quotation omitted).
“If the meaning of the contract language is unclear, [courts] ‘consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.’ ” Id. (citations omitted). “Any ambiguities in the language of the contract are interpreted against the insurer who used them and in favor of the insured.” Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623, 635 (2013) (citation omitted). I “may conclude that language is ambiguous only ‘where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.’ ” Surabian Realty Co., Inc., 462 Mass. at 718 (citations omitted). “[A]n ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other.” Id. (alteration in original; citations omitted). “An exclusionary clause may be ambiguous . . . when read in the context of the entire policy or as applied to the subject matter.” County of Barnstable v. American Fin. Corp., 51 Mass.App.Ct. 213, 215 (2001).
The word the court must construe here is “residence.” As the Entwistles point out, the Supreme Judicial Court has recognized that the word “Residence is not a word of uniform significance, but is used in different senses.” Shepard v. Finance Assocs. of Auburn, Inc., 366 Mass. 182, 190 (1974) (citation omitted); Krakow v. Department of Pub. Welfare, 326 Mass. 452, 454 (1950) (“residence” may have a “flexible meaning”). The “varied meanings” of the word residence “rang[e] from domicil down to personal presence with some slight degree of permanence.” Rummel v. Peters, 314 Mass. 504, 511 (1943). Residence can also mean “[a] house or other fixed abode; a dwelling.” Black’s Law Dictionary at 1310 (7th ed. 1999).
Consideration of another provision of Coverage C provides guidance and demonstrates that the word “residence” as used in the Safety policy is not ambiguous. See Surabian Realty Co., Inc., 462 Mass. at 718 (construing policy as a whole). The Safety policy provides a list of 16 perils against which it insures “for direct physical loss to [personal] property” including fire and theft. Excluded from the theft coverage is “loss caused by theft that occurs off the ‘residence premises’ of [personal p]roperty while at any other residence owned by, rented to, or occupied by an ‘insured,’ except while an ‘insured’ is temporarily living there.” (Emphasis added.) If “residence” were to mean only a place where an insured is living, the language of occupancy in the theft exclusion — "except while an ‘insured’ is temporarily living there" — would be redundant or meaningless. “It is a standard rule of construction that interpretations which result in meaningless words are to be avoided.” Gibraltar Fin. Cop. v. Lumbermens Mut. Cas. Co., 400 Mass. 870, 872 (1987). See Deutsche Bank Nat’l Ass’n, 465 Mass. at 748 (court must give every word in insurance policy “meaning and effect whenever practicable”).
Construing the policy as a whole, I conclude the 10% sub-limit does not require that the insured be living at the “insured’s residence” at the time of the loss, temporarily or otherwise. See Surabian Realty Co., Inc., 462 Mass. at 718. Accordingly, the Vermont house is an “ ‘insured’s’ residence” under the Safely policy and the 10% sub-limit properly applies.
The Appeals Court’s decision in Nelson v. Cambridge Mut. Fire. Ins. Co., 30 Mass.App.Ct. 671 (1991), is not contrary to this conclusion. In Nelson, the court interpreted a provision in a homeowners policy that was identical to the provision at issue here. 30 Mass.App.Ct. at 672. There, the plaintiff “packed his belongings in his rented premises in anticipation of moving the next day to his new home . . . That night, a fire broke out in his rented premises . . . and destroyed most of his personal property. ” Id. at 671. After plaintiff sought coverage under the homeowners policy that covered his new house, the court held that the 10% sub-limit applied because the apartment was not the “residence premises” and because the plaintiff was living at the apartment at the time of the fire. Id. at 674-75. Certainly if the Entwistles had been living at the Vermont house at the time of the fire, like the plaintiff in Nelson, they could not dispute that the 10% sub-limit would apply. Nelson, however, does not stand for the proposition that an insurer must be living in the “residence” at the time of the loss for the personal property to fall within the 10% sub-limit, especially in light of the theft exclusion, discussed above.
My reading of the Safety policy also accords with the objectively reasonable expectations of the parties. The 10% sub-limit is designed to circumscribe Safety’s risk for an insured’s loss of personal property anywhere in the world. If plaintiffs were correct that the sub-limit was to be narrowly construed and limited only to other places where the insured resides, Safety *565 would be exposed to risk up to the full amount of its personal property coverage from personal property loss at any, numerous and undisclosed vacation homes or furnished rental properties that an insured owned. In such a situation, simply by carrying a homeowners policy on her principal residence, a homeowner could substantially reduce or eliminate the need for personal property coverage at such other properties, provided she did not live at those other properties. This is far more risk than a reasonable person would understand or expect Safety to have undertaken.[11]
B. The York Policy
Under New Hampshire law,[12] “[t]he interpretation of an insurance policy, like any contract, is an issue of law for the court to decide.” Great Am. Dining, Inc. v. Philadelphia Indem. Ins. Co., 164 N.H. 612, 617 (2013). The court reads the insurance policy as a whole id. at 619, and examines the insurance policy language using an objective standard by “look[ing] to the plain and ordinary meaning of the policy’s words in context, . . . ‘and . . . constru[ing] the terms of the policy as would a reasonable person in the position of the insured based on more than a casual reading of the policy as a whole.’ "Id. at 616 (citations omitted). The court conducts this examination by “consider[ing] how the policy provisions interact in order to better understand a provision’s meaning.” Id. at 622 (alteration in original; citation omitted). “(W]here the terms are clear and unambiguous, [courts] accord the language its natural and ordinary meaning.” Barking Dog, Ltd. v. Citizens Ins. Co. of Am, 164 N.H. 80, 83 (2012) (citation omitted). “[F]or exclusionary language to be considered clear and unambiguous, two parties cannot reasonably disagree about its meaning . . . Thus, when an insurance policy’s language is ambiguous and one reasonable interpretation favors coverage, [courts] construe the policy in the insured’s favor and against the insurer.” Id. at 84 (citations omitted).
New Hampshire courts have not addressed the meaning of the word “residence” in this context. The Entwistles rely on two cases where the Supreme Court of New Hampshire held that the “definition of ‘residence’ considers two factors that must occur simultaneously: (1) the person must physically dwell at the claimed residence; and (2) the person must regard the claimed residence as his principal place of abode.” Belanger v. MMG Ins. Co., 153 N.H. 584, 587 (2006); Concord Grp. Ins. Cos. v. Sleeper, 135 N.H. 67, 70 (1992). Neither case, however, concerned a homeowners policy and neither policy used the word “residence.” See Belanger, 153 N.H. at 585, 587; Concord Grp. Ins. Cos., 135 N.H. at 68, 70. Both cases dealt with the provision in an automobile insurance policy that provided coverage to a “family member" defined as “a person related to [the policy holder] by blood, marriage or adoption who is a resident of [the policy holder’s] household.” Belanger, 153 N.H. at 585 (emphasis added; alterations in original). See Concord Grp. Ins. Cos., 135 N.H. at 70 (providing coverage to “relative” defined as “relative of the named insured who is a resident of the same household” (emphasis added)). See also White v. Vermont Mut. Ins. Co., 106 A.3d 1159, 1160, 1162-63 (N.H. 2014) (considering whether insured’s son, who lived primarily in Massachusetts but visited mother for vacations, fell within homeowners provision extending coverage to “residents of your household who are . . . your relatives” (ellipses in original)).
Without a decision from a New Hampshire court defining the term “residence,” I turn to the actual policy terms. See Great Am Dining, Inc., 164 N.H. at 616-17. As with the Safety policy, another provision of Coverage C in the York policy is instructive and demonstrates that the word “residence” is not ambiguous. The York policy also lists 16 perils against which it insures “for direct physical loss to [personal] properly” including fire and theft. Expressly excluded from the coverage for theft is “loss caused by theft . . . [t]hat occurs off the ‘residence premises’ of . . . [personal property while at any other residence owned by, rented to, or occupied by an ‘insured,’ except while an ‘insured’ is temporarily living there.” Similar to the Safety policy, if “residence” was limited to a place where an insured lived, the language in the theft exclusion would be rendered redundant and meaningless. See Great Am. Dining, Inc., 164 N.H. at 619 (courts must construe insurance policy as a whole). In New Hampshire, just as in Massachusetts, “language in [an] insurance policy [is] not presumed to be mere surplusage!,]” Progressive Ins. Co. v. Argonaut Ins. Co., 161 N.H. 778, 782 (2011) (citation omitted), and a court may not interpret a policy in a “way [that] contravenes the explicit language of the policy and renders the . . . exclusion meaningless.” Weeks v. Co-Operative Ins. Cos., 149 N.H. 174, 178 (2003). The same principles animating my conclusion with respect to the Safety policy apply to construing the York policy language.[13]
III. The Claim Against Safety Under G.L.c. 93A
Safety has moved for summary judgment on the Entwistles’ claim that it violated G.L.c. 93A, §9, and G.L.c. 176D, §3(9), by refusing to make payment for the lost property usually located at the Cambridge house unless the Entwistles agreed that the 10% sub-limit applied to the remainder of the property. “[T]o pay without a release is not a settlement.” Lazaris v. Metropolitan Prop. & Cas. Ins. Co., 428 Mass. 502, 506 (1998). The general rule with respect to settlements is that “an insurer may condition payment of the policy limits on the plaintiffs execution of a release, even when liability is reasonably clear and damages exceed the limits of the policy.” Davis v. Allstate Ins. Co., 434 Mass. 174, 179 (2001), citing Lazaris, 428 Mass. at 505-06. That Safety conditioned payment on the Entwistles’ release of claims against *566 Safety does not, without more, violate G.L.c. 93A or G.L.c. 176D.
An added wrinkle here, however, is that Safety’s offer to pay the 10% sub-limit also included the personal property usually located in the Cambridge house that it now admits does not fall within the 10% sub-limit.[14] “It is an unfair settlement practice, and also an unfair or deceptive act or practice under G.L.c. 93A ... if an insurance company fails ‘to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.’ ” Lazaris, 428 Mass. at 502. Whether Safety’s settlement offer was fair and equitable is a question of fact, see Clegg v. Butler, 424 Mass. 413, 422 (1997) (where insurer “had amassed enough information to know it was highly probable that it would be liable to the full extent of its policy, the judge [after bench trial] was warranted in finding that the structured settlement offers finally offered . . . were ‘unreasonably low,’ ‘unrealistic,’ and ‘unjustified’ ”), as is the question of whether liability was “reasonably clear.” See Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass.App.Ct. 955, 956-57 (1995) (“Whether the defendant’s liability . . . became ‘reasonably clear’ calls for an objective standard of inquiry into the facts . . . [and] calls upon the fact finder to determine whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff’ (citation omitted)). These factual disputes preclude entry of summary judgment on the Entwistles’ claim under G.L.c. 93A against Safety, insofar as it concerns Safety’s offer of settlement with respect to the personal property usually located in the Cambridge house.
ORDER
York’s motion for summary judgment is ALLOWED as to all counts against it. Safety’s motion for summary judgment is ALLOWED as to Counts IV, V and VI, except insofar as those counts concern the personal property usually located at the Cambridge house and/or the offer to settle the claim based thereon and in this regard only Safety’s motion is DENIED. The Entwistles’ motion for partial summary judgment is DENIED.

 The Entwistles moved to strike certain of defendants’ exhibits and statements of facts. I do not rely on those exhibits or facts and therefore deny those motions as moot.

 The Safety policy lists Anne and Elizabeth H. de Schweinitz as the insureds. For simplicity, I will refer to the insureds as the Entwistles.

 Safety disputes this fact. Rather than citing to the record in accordance with Superior Court Rule 9A(b)(5)(ii), and despite the fact that discovery has ended, Safety claims that it “does not have sufficient knowledge or information to form a belief as to the truth of this statement.” Safety’s Response to Plaintiffs Statement No. 6. It makes the same claim with respect to a number of other facts. Such a statement is not sufficient to contest a fact at the summary judgment stage. The summary judgment record supports the plaintiffs’ statement of fact, and it is deemed admitted, as are other facts recited herein to which Safety makes similar statements. See Superior Court Rule 9A(b)(5)(ii) (“For purposes of summary judgment, the moving party’s statement of a material fact shall be deemed to have been admitted unless controverted as set forth in this paragraph”).

 Although Safety and York do not dispute this fact with any record citation, see Plaintiffs’ Statement No. 34, a statement made by Erik during his deposition could be viewed as tangentially inconsistent, when he said he had not taken items of property from the Cambridge house to the Vermont house with the specific intention of moving it to the New Hampshire house when it was ready to occupy. Any conflict is immaterial. It is undisputed that the property lost in the fire was never located in fire New Hampshire house.

 Which specific items of property fall into each category, and what the magnitude of the claim is as to the loss in each category, is not before me.

 Safety concedes its policy covers the loss of personal property which was usually located at the Cambridge house without the constraint of the 10% sub-limit. Safety’s liability for that category of personal property is not at issue in the contract-based counts against Safety (Counts IV and V), although the amount of that loss has yet to be determined.

 Both York and Safety rely on Zulick v. Patrons Mut. Ins. Co., 287 Conn. 367 (2008), to support their argument that an insured need not be living at a dwelling owned by the insured for the 10% sub-limit to apply to a personal property loss at that dwelling. In Zulick, the plaintiffs owned two adjacent properties, living in one and renting out the other. 287 Conn. at 369. The rental property consisted of a residence, which tenants occupied, and a bam and carriage shed, in which the plaintiffs stored their own personal property. Id. A fire in the bam and carriage shed destroyed that personal property, and the plaintiffs sought coverage for the loss under the homeowners policy insuring the house in which they lived. Id. The policy language was slightly different from the language at issue here, applying a 10% sub-limit to “personal property usually on residential premises of an [¡Insured other than the [ijnsured premises." Id. at 370 (alterations in original). The phrase “insured premises” in Zulick is the equivalent of the phrase “residence premises” in the Safety and York policies. See id.. The Supreme Court of Connecticut held “that an insured of ordinary intelligence and experiences reasonably would expect the phrase ‘residential premises of an [ijnsured’ to apply to all residential premises that are owned by the insured, regardless of whether the insured uses or occupies the premises.” Id. at 374 (emphasis and alteration in original). Although I reach a similar outcome in this case, I do not rely on Zulick as persuasive authority.

 See also Zulick v. Patrons Mut. Ins. Co., 287 Conn, at 374-76 & n.5.

 The Entwistles and York agree New Hampshire law governs interpretation of the York policy.

 Given my conclusion that York properly applied its policy’s 10% sub-limit, it could not have violated G.L.c. 93A on the facts of this case. See Transamerica Ins. Co. v. KMS Patriots, L.P., 52 Mass.App.Ct. 189, 197 (2001) (“When coverage has been correctly denied, as in this case, no violation of the Massachusetts statutes proscribing unfair or deceptive trade practices may be found”). I need not address York’s argument that G.L.c. 93A does not apply to its actions, which occurred outside Massachusetts.

 In their demand letter to Safety, the Entwistles informed Safety that some of the personal property lost in the fire “previously had been stored at the Entwistles’ Cambridge home.”