Rockingham
No. 2011-693

THE BARKING DOG, LTD.

v.

CITIZENS INSURANCE COMPANY OF AMERICA

Argued: April 11, 2012
Opinion Issued: August 17, 2012

*Hoefle, Phoenix, Gormley & Roberts, P.A.*, of Portsmouth (*Lawrence B. Gormley* on the brief and orally), for the plaintiff.

*Robinson & Cole LLP*, of Boston, Massachusetts (*Caryn L. Daum* on the brief and orally), for the defendant.

CONBOY, J. In this declaratory judgment proceeding, the defendant, Citizens Insurance Company of America, appeals an order of the Superior

Court (*McHugh*, J.) ruling in favor of the plaintiff, The Barking Dog, Ltd., which operates a dog kennel and grooming business at several locations in New Hampshire. The court ruled that an insurance policy (the policy) issued by the defendant provides coverage for damage to the plaintiff's septic system and ordered the defendant to pay the plaintiff $20,000, the agreed upon damage amount. The court also ruled that the defendant was not prejudiced by the plaintiff's failure to disclose its expert's report in a timely manner or its failure to disclose its expert's *curriculum vitae* and, accordingly, permitted the plaintiff's expert to testify at trial. The defendant argues that both rulings were error. We affirm.

The following facts are derived from the record. On February 25, 2010, after a heavy rainfall, the septic system at the plaintiff's Derry facility failed. The plaintiff made a claim under the policy, but the defendant denied it, relying on certain policy exclusions. On June 23, 2010, the plaintiff petitioned the superior court for a declaration that it is entitled to coverage.

It is undisputed that the septic system failed due to the failure of the pump portion of the system. Both parties retained experts to determine the precise cause of the pump failure. The trial court noted that "their general conclusions were quite similar" and "[t]his is not a case where the two experts were 180 degrees apart in their assessment of this loss." Ultimately, the court adopted the plaintiff's expert's theory that "the significant and highly unusual amount of rainfall on the day in question coupled with the existing melting of snow, created such a serious groundwater condition so as to cause the cement risers surrounding the pump chamber to move, thereby allowing water and other materials to enter the chamber itself and cause its failure."

The plaintiff argued that it is entitled to coverage under the policy's "Broad Form Water Damage" (BFWD) provision, which was added to the policy through a "Special Broadening Endorsement" that "amend[ed] coverage provided under the [policy] through new coverages and broader coverage grants." The BFWD provision first deletes two of the policy's so-called "water exclusions," which exclude coverage for damage caused by:

> Water that backs up or overflows from a sewer, drain or sump; or
> Water under the ground surface pressing on, or flowing or seeping through:
> (a) Foundations, walls, floors or paved surfaces;
> (b) Basements, whether paved or not; or
> (c) Doors, windows or other openings.

The BFWD provision then adds, to the "Additional Coverages" section of the policy, coverage for damage described in language identical to those

water exclusions. Thus, absent the BFWD provision, such damage would be excluded from coverage. The plaintiff's specific argument is that it is entitled to coverage under the BFWD provision because "[t]he cause of the damage [to the pump chamber] was groundwater."

The defendant acknowledged that the BFWD provision provides coverage for some damage that would otherwise not be covered. However, the section to which the BFWD provision was added specifically states that "[a]ll policy Exclusions . . . apply." Accordingly, the defendant maintained that the damage at issue is barred by another of the policy's water exclusions that was unaffected by the BFWD provision, as well as by an "earth movement exclusion." The water exclusion relied upon by the defendant excludes coverage for damage caused by "[f]lood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not." The earth movement exclusion excludes coverage for damage caused by:

> Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

The plaintiff argued, however, that these exclusions are inapplicable because the BFWD provision added by the special endorsement supersedes them. The defendant responded that the special endorsement did not alter or modify these water or earth movement exclusions.

In a declaratory judgment proceeding to determine the coverage of an insurance policy, the burden of proof is on the insurer. *Carter v. Concord Gen. Mut. Ins. Co.*, 155 N.H. 515, 517 (2007); RSA 491:22-a (2010). After considering the experts' testimony and the policy provisions, the court concluded that "given the cause of this loss, the policy provisions are ambiguous." It explained that "any ambiguity in insurance policies inures to the benefit of the policy holder," and thus ruled that the loss is covered under the policy. This appeal followed.

Resolution of this case requires us to interpret the language of the policy, which is a question of law that we review *de novo. See Webster v. Acadia Ins. Co.*, 156 N.H. 317, 319 (2007). "We construe the language as would a reasonable person in the position of the insured based upon a more than casual reading of the policy as a whole." *Id.* at 319-20. "Policy terms are construed objectively; where the terms are clear and unambiguous, we accord the language its natural and ordinary meaning." *Id.* at 320. "Absent

a statutory provision or public policy to the contrary, an insurance company is free to limit its liability through an exclusion written in clear and unambiguous policy language." *Philbrick v. Liberty Mut. Fire Ins. Co.*, 156 N.H. 389, 391 (2007). However, for exclusionary language to be considered clear and unambiguous, two parties cannot reasonably disagree about its meaning. *Id.* Thus, when an insurance policy's language is ambiguous and one reasonable interpretation favors coverage, we construe the policy in the insured's favor and against the insurer. *Progressive N. Ins. Co. v. Argonaut Ins. Co.*, 161 N.H. 778, 781 (2011).

We must first determine whether the damage falls within an area of coverage. *See* S. PLITT ET AL., COUCH ON INSURANCE 3d § 22:2, at 22-6 (2010) ("Generally, the insuring agreement of an insurance policy should be construed before the exclusions to avoid confusion and error."). We therefore examine the cause of the damage to determine whether it falls within the coverage granted by the BFWD provision in the first instance.

The trial court adopted the plaintiff's expert's damage theory. The plaintiff's expert testified that the pump chamber is a concrete box containing the pump. He explained that there were high groundwater conditions on the day in question, and, as a result, the groundwater surrounding the pump chamber created an uplifting pressure called "buoyancy force." That force exerted pressure on the bottom and sides of the pump chamber, which caused the chamber to float. In turn, concrete risers sitting atop the chamber shifted, allowing groundwater and soil to infiltrate the chamber, thereby causing the pump to fail.

The BFWD provision grants, in relevant part, coverage for damage caused by "[w]ater under the ground surface pressing on, or flowing or seeping through . . . [f]oundations, walls, floor[s] or paved surfaces." Given the expert testimony submitted by the plaintiff, the damage falls within the scope of this coverage — the damage was caused by "water under the ground" pressing on the walls and floor of the pump chamber, a concrete box. The defendant contends that the terms "walls" and "floor" cannot be applied to the pump chamber because both terms "can . . . only reasonably be construed as applying to parts of a building, not parts of a subterranean septic system." We decline to adhere to such a narrow construction of these terms.

Although "walls" and "floors" are typically associated with buildings, we see no reason why one would not refer to the bottom of a box as its floor and the sides perpendicular thereto as its walls. These terms offer a simple, easily-understood description of the orientation of the surfaces of a box and, thus, using these terms for such a descriptive purpose is consistent

with their "natural and ordinary meaning." *Webster*, 156 N.H. at 320. Accordingly, in the first instance, the damages at issue fall within the BFWD coverage provision.

Next, we consider the exclusions. On appeal, the defendant relies only upon the earth movement exclusion, and we thus confine our analysis to that exclusion. The earth movement exclusion, in relevant part, excludes coverage for damage caused by the following:

> [S]oil conditions which cause settling, cracking or other *disarrangement of foundations or other parts of realty.* Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of *water under the ground surface.*

(Emphases added.) This exclusion arguably applies here. The damage to the pump chamber was caused by "water under the ground surface" and the pump chamber could fairly be considered a "part of realty." This exclusion, however, directly contradicts the BFWD provision, which provides coverage for damage resulting from *"[w]ater under the ground surface* pressing on, or flowing or seeping through . . . *foundations, walls, floor[s] or paved surfaces."* (Emphases added.)

This contradiction is reflected in *Amherst Country Club, Inc. v. Harleysville Worcester Insurance Co.*, 561 F. Supp. 2d 138 (D.N.H. 2008). In *Amherst Country Club, Inc.*, the insured drained its pool for annual spring cleaning, and, due to high groundwater conditions, the pool floated up and out of the ground. *Id.* at 141-42. This caused the pool to crack and break, leading to its ultimate destruction. *Id.* The insured's policy was nearly identical to the one at issue here, except that the insured had not purchased BFWD coverage and thus the water exclusions remained fully in effect. *See id.* at 142.

The court focused its inquiry on the earth movement exclusion discussed above and the water exclusion that excludes coverage for "[w]ater under the ground surface pressing on, or flowing or seeping through . . . [f]oundations, walls, floors or paved surfaces." *Id.* at 142-49. The court held that coverage could be excluded under either provision, *id.* at 143-49, demonstrating that these exclusions substantially overlap and that if one were designated as an area of coverage and the other remained an exclusion, they would substantially conflict.

Here, the special endorsement eliminated the subject water exclusion and added coverage, through its BFWD provision, for damages that otherwise would have been excluded under the subject water exclusion. The

earth movement exclusion, however, remained unaltered. Thus, the special endorsement's grant of BFWD coverage contradicts the earth movement exclusion.

■ When forced to reconcile contradictory clauses in an insurance policy, "we must adopt the interpretation which most correctly reflects the reasonable expectations of the insured." *Commercial Union Assurance Co. v. Gilford Marina, Inc.*, 119 N.H. 788, 790 (1979). "In so doing, the test is whether the ordinary layman in the position of the insured could reasonably be expected to understand that certain exclusions qualified the policy's grants of coverage." *Gilford Marina, Inc.*, 119 N.H. at 790 (quotation omitted).

■ Under these circumstances, we cannot conclude that a layperson could reasonably be expected to understand that even though he paid for additional coverage that covers the damage at issue, the policy would nevertheless exclude coverage for such damage because another policy provision negates the additional grant of coverage. Simply put, a reasonable layperson would not understand that the additional coverage he paid for does not actually provide such coverage. Accordingly, we uphold the trial court's ruling that the policy provides coverage for the damage to the plaintiff's septic system.

Finally, we address the defendant's claim that the court erred when it allowed the plaintiff's expert to testify. In a motion *in limine*, the defendant argued that it was prejudiced by the plaintiff's failure to timely disclose its expert's report and its failure to make disclosures required by RSA 516:29-b (2007). Thus, it argued, the plaintiff's expert should be precluded from testifying. The court disagreed and permitted the plaintiff's expert to testify. The defendant argues that this ruling was error. We disagree.

■ We will uphold a trial court's decision to admit evidence absent an unsustainable exercise of discretion. *State v. Roldan*, 151 N.H. 283, 286 (2004). "This same standard applies to review of the trial court's decision with respect to alleged discovery violations." *State v. Gamester*, 149 N.H. 475, 478 (2003). "To show that the trial court's decision is not sustainable, the defendant must demonstrate that the ruling was clearly untenable or unreasonable to the prejudice of his case." *Roldan*, 151 N.H. at 286. "In the context of a discovery violation, actual prejudice exists if the defense has been impeded to a significant degree by the nondisclosure." *Id.* at 287 (quotation omitted). The trial court has wide discretion in admitting or excluding expert testimony. *Id.* at 286.

■ The defendant has failed to establish that it suffered actual prejudice. Although the plaintiff did not provide its expert report by the disclosure

deadline set by the court, it did provide the three-page report approximately three months prior to trial. Thus, the defendant had ample time to examine the report and prepare to contest it at trial.

As to RSA 516:29-b, it is clear from the record that the plaintiff did not satisfy the disclosure requirements set forth therein, which, in relevant part, require disclosure of the qualifications of the witness, the compensation to be paid to the witness, and a list of prior cases in which the witness testified. It appears that, to meet these statutory requirements, the plaintiff had planned to provide its expert's *curriculum vitae* prior to trial. The defendant argues that the plaintiff's failure to do so prevented it from closely scrutinizing the expert's background. Nonetheless, we cannot conclude that, as a result, the defendant suffered actual prejudice.

Although it might have been easier to challenge the plaintiff's expert's conclusion had the required disclosures been made, that does not mean the defendant was "impeded to a significant degree by the nondisclosure." *Roldan*, 151 N.H. at 287 (quotation omitted). The defendant still had ample tools at its disposal. It had the plaintiff's expert's report, and it had the plaintiff's expert's name and the organization for which he works. This information presumably could have been used to research the expert's qualifications. The defendant also had the ability to challenge the plaintiff's expert's damage theory on its merits through the testimony of its own expert. Furthermore, it does not appear that either of the experts' qualifications were significant factors in the court's conclusion; the court's order focused not on the qualifications of the experts, but rather on the reasonableness of the experts' theories, whose general conclusions, it noted, "were quite similar." Under these circumstances, therefore, we cannot conclude that the decision of the trial court to allow the plaintiff's expert to testify was clearly untenable or unreasonable to the prejudice of the defendant's case. *See id.* at 287.

*Affirmed.*

DALIANIS, C.J., and HICKS and LYNN, JJ., concurred.