544

Rockingham
No. 2014-020

## DOUG MELLIN & a.

v.

## NORTHERN SECURITY INSURANCE COMPANY, INC.

Argued: October 15, 2014
Opinion Issued: April 24, 2015

*Drummond Woodsum & MacMahon*, of Portsmouth (*Keriann Roman* on the brief and orally), for the plaintiffs.

*Primmer Piper Eggleston & Cramer PC*, of Manchester (*Gary M. Burt* on the brief and orally), for the defendant.

CONBOY, J. The plaintiffs, Doug and Gayle Mellin, brought a declaratory judgment action asserting, in relevant part, that their homeowner's insurance policy with the defendant, Northern Security Insurance Company, Inc. (Northern), requires Northern to reimburse them for losses to their condominium caused by cat urine odor. The plaintiffs appeal an order of the Superior Court (*Wageling*, J.) granting summary judgment in favor of Northern. We vacate in part, reverse in part, and remand.

*I. Background*

The record on summary judgment supports the following facts or they are otherwise undisputed. The plaintiffs owned a condominium unit in Epping (unit). Their downstairs neighbor kept two cats in her condominium. The plaintiffs leased their unit to a tenant who was the first person to detect a cat urine odor in the unit in 2009 or 2010. In November 2010, after their tenant moved out due to the odor, the plaintiffs moved into the unit and also noticed the odor. They surmised that it entered their unit from the downstairs condominium through an open plumbing chase servicing the kitchen. In December 2010, the plaintiffs filed a claim under their homeowner's insurance policy, which was denied.

Epping's building/health inspector examined the unit and, on December 22, 2010, sent a letter to the plaintiffs stating that they "have a health problem existing" and the odor "is such that [they] need to move out of[] the apartment temporarily and have a company terminate the odor." Remediation proved unsuccessful. The plaintiffs continued to reside in the unit until February 1, 2011. They claimed that, after that time, they "could [not] have tenants," although they occasionally occupied the unit. Ultimately, they sold their condominium. They assert, however, that the sale price for the unit was significantly less than that for a comparable condominium in the area which was unaffected by cat urine odor.

Section I of the plaintiffs' homeowner's insurance policy, addressing property coverages, contains two disputed coverage provisions. The first disputed provision, "Coverage A," provides coverage, in relevant part, for "alterations, appliances, fixtures and improvements which are part of the building contained within the 'residence premises'" and, through an endorsement, "insure[s] against risk of direct loss to property . . . if that loss is a *physical loss to property*" (Coverage A endorsement). (Emphasis added.) The Coverage A endorsement also contains what is commonly referred to as a "pollution exclusion clause," which states, in part: "We do not insure, however, for loss . . . [c]aused by . . . [d]ischarge, dispersal, seepage, migration, release or escape of pollutants . . . ." The second disputed provision in Section I, "Coverage D," provides coverage for "Loss Of Use" of the "residence premises," including additional living expenses and lost rental income.

In their petition, the plaintiffs sought a declaration that they are entitled to coverage because they "experienced a direct physical loss" to the unit as a result of the cat urine odor. Northern moved for summary judgment, arguing that the alleged cat urine odor "does not constitute a physical loss" within the meaning of Coverage A and that the pollution exclusion clause "specifically bars recovery." Northern also argued that Coverage D did not apply because the alleged cat urine odor was not caused by any of the enumerated perils against which the policy insured. The trial court agreed with Northern and granted its motion. This appeal followed.

## II. Standard of Review

"We review *de novo* the trial court's application of the law to the facts in its summary judgment ruling." *Amica Mut. Ins. Co. v. Mutrie*, 167 N.H. 108, 111 (2014) (quotation omitted). "We consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party." *Id.* (quotation and brackets omitted). "If our review of the evidence does not reveal a genuine issue of material

fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the trial court's decision." *Id.* (quotation omitted).

Resolving the issues in this case requires us to interpret the language of the policy. The interpretation of insurance policy language, like any contract language, is ultimately an issue of law for this court to decide. *Id.* "Policy terms are construed objectively; where the terms are clear and unambiguous, we accord the language its natural and ordinary meaning." *Barking Dog v. Citizens Ins. Co. of America*, 164 N.H. 80, 83 (2012) (quotation omitted). "Where disputed terms are not defined in the policy, we construe them in context, and in the light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." *Great Am. Dining v. Philadelphia Indem. Ins. Co.*, 164 N.H. 612, 625 (2013) (quotation omitted). "Absent a statutory provision or public policy to the contrary, an insurance company is free to limit its liability through an exclusion written in clear and unambiguous policy language." *Barking Dog*, 164 N.H. at 83-84 (quotation omitted). "However, for exclusionary language to be considered clear and unambiguous, two parties cannot reasonably disagree about its meaning." *Id.* at 84. "Thus, when an insurance policy's language is ambiguous and one reasonable interpretation favors coverage, we construe the policy in the insured's favor and against the insurer." *Id.* "In a declaratory judgment action to determine the coverage of an insurance policy, the burden of proof is always on the insurer, regardless of which party brings the petition." *Cogswell Farm Condo. Ass'n v. Tower Group, Inc.*, 167 N.H. 245, 248 (2015); *see* RSA 491:22-a (2010).

## III. Coverage A

The plaintiffs argue that the trial court erred by concluding that they were not entitled to coverage under the Coverage A endorsement because they did not suffer a "physical loss" to the property. They further contend that the trial court erred by finding that the pollution exclusion clause in the Coverage A endorsement independently precluded coverage.

### A. Physical Loss Under Coverage A Endorsement

The Coverage A endorsement states: "We insure against risk of direct loss to property described in Coverage A, only if that loss is a *physical loss* to property." (Emphasis added.) The plaintiffs argue that they are entitled to coverage under this endorsement because "physical loss" encompasses pervasive odors.

Northern first argues that the plaintiffs' objection to the motion for summary judgment did not satisfy the statutory requirements for opposing

summary judgment. *See* RSA 491:8-a, IV (2010) (requiring party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial"); *see also* RSA 491:8-a, III (2010) (setting forth requirements for granting summary judgment). However, because Northern has not demonstrated that it raised this issue before the trial court, we decline to address it. *Mutrie*, 167 N.H. at 114.

Northern next contends that, although "the words 'direct' and 'physical loss' are undefined" in the Coverage A endorsement, "they are commonly understood to require tangible change to the property," and that the alleged cat urine odor did not constitute a physical loss under the plain meaning of the policy because it "did not cause[ ] a tangible alteration to the appearance, color, or shape" of the unit. Because, as Northern notes, the policy does not define the term "physical loss," we give the words their ordinary meaning. *See Pawtucket Mut. Ins. Co. v. Hartford Ins. Co.*, 147 N.H. 369, 372 (2001). The disputed term is "physical," which is broadly defined and refers, in relevant part, to things "[o]f or pertaining to matter, or the world as perceived by the senses; material as [opposed] to mental or spiritual." 2 SHORTER OXFORD ENGLISH DICTIONARY 2194 (6th ed. 2007). We are not persuaded that the common understanding of the word "physical" requires the restricted reading Northern proposes. Rather, we conclude that "physical loss" need not be read to include only tangible changes to the property that can be seen or touched, but can also encompass changes that are perceived by the sense of smell.

We recognize that some jurisdictions have adopted a more limited interpretation of "physical loss." *See, e.g., Universal Image Productions, Inc. v. Chubb Corp.*, 703 F. Supp. 2d 705, 709, 710 (E.D. Mich. 2010) (concluding that allegations of what court deemed to be intangible harms, such as pervasive odor, mold and bacterial contamination, and water damage, did not constitute physical loss), *aff'd sub nom. Universal Image Prod. v. Federal Ins. Co.*, 475 Fed. Appx. 569 (6th Cir. 2012); *Great Northern Ins. v. Benjamin Franklin Fed. S & L*, 793 F. Supp. 259, 263 (D. Or. 1990) (finding no " 'direct physical loss' " from discovery of asbestos insulating material because building "remained physically intact and undamaged"), *aff'd*, 953 F.2d 1387 (9th Cir. 1992). However, our interpretation that "physical loss" encompasses changes to the insured property perceived by the sense of smell is supported by a substantial body of case law in which a variety of contaminating conditions, including odors, have been held to constitute a physical loss to property. *See Yale University v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 412-13 (D. Conn. 2002) (citing cases and concluding plaintiff sustained its burden of demonstrating that it suffered

" 'physical loss of or damage to property' " as required under policy by alleging presence of asbestos and lead contamination in buildings).

For example, a federal district court recently rejected an insurer's argument that, because " 'physical loss or damage' necessarily involves 'a physical change or alteration to insured property requiring its repair or replacement,' " the plaintiff's policy did not cover losses sustained when an ammonia spill temporarily incapacitated the plaintiff's facility. *See Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of America*, Civ. No. 2:12-cv-04418 (WHW), 2014 WL 6675934, at \*2, \*3, \*8 (D.N.J. Nov. 25, 2014). The court concluded, instead, that under New Jersey law the release of ammonia "physically transformed the air" in the facility, rendering it "unfit for occupancy until the ammonia could be dissipated." *Id.* at \*6. The court also concluded that the ammonia discharge constituted physical loss under Georgia law because it "physically changed the facility's condition to an unsatisfactory state needing repair." *Id.* at \*7. Similarly, the Colorado Supreme Court concluded that gasoline and vapors that had infiltrated and contaminated the foundation, halls, and rooms of a church, making it uninhabitable and its use dangerous, constituted "direct physical loss" to the property. *See Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 54, 55 (Colo. 1968) (quotation omitted); *see also TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 709-10 (E.D. Va. 2010) (determining that toxic gases released by drywall rendered home uninhabitable and damage constituted a direct physical loss), *aff'd*, 504 Fed. Appx. 251 (4th Cir. 2013); *Farmers Ins. Co. v. Trutanich*, 858 P.2d 1332, 1335 (Or. Ct. App. 1993) (concluding that pervasive odor from methamphetamine lab that had infiltrated house "was 'physical' because it damaged the house"); *Murray v. State Farm Fire and Cas. Co.*, 509 S.E.2d 1, 17 (W. Va. 1998) (recognizing that direct physical loss requires property to be damaged, not destroyed, and may exist without structural damage to insured property). These cases stand for the proposition that an insured may suffer "physical loss" from a contaminant or condition that causes changes to the property that cannot be seen or touched.

Nonetheless, as other courts have noted, the term "physical loss" should not be interpreted overly broadly. *See, e.g., Pentair v. American Guarantee and Liability Ins.*, 400 F.3d 613, 616 (8th Cir. 2005) (recognizing that direct physical loss or damage cannot be interpreted to apply "whenever property cannot be used for its intended purpose" (emphasis omitted)). Northern suggests that the definition of "physical injury" that we utilized in *Webster v. Acadia Insurance Co.* is instructive. *See Webster v. Acadia Ins. Co.*, 156 N.H. 317 (2007). *Webster*, however, is inapposite. In *Webster*, a third party liability case in which we considered an insurer's duty to defend, we interpreted the term "property damage." *Id.* at 318, 320. Here, although the

policy defines "[p]roperty damage" as "physical injury to, destruction of or loss of use of tangible property," that term relates only to Coverage E, personal liability, which is described in Section II of the policy (liability coverages). Because Coverage E is not at issue in this case, the definition of "[p]roperty damage" relevant in *Webster* does not control our interpretation of "physical loss" in Coverage A.

We, instead, look to the type of loss courts in other jurisdictions have considered sufficient to constitute a physical loss. Some courts have recognized that physical loss "provisions require only that a covered property be injured, not destroyed" and that physical loss "may exist in the absence of structural damage to the insured property." *Sentinel v. New Hampshire Ins.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997); *see also Murray*, 509 S.E.2d at 17. Others conclude that physical loss contemplates a change that causes the insured property, which was "in a satisfactory state ·. . ·. [,] to become unsatisfactory for future use or requiring that repairs be made to make it so." *AFLAC Inc. v. Chubb & Sons, Inc.*, 581 S.E.2d 317, 319 (Ga. Ct. App. 2003). Still others limit coverage to physical losses that are "distinct and demonstrable," *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, No. Civ. 98-434-HU, 1999 WL 619100, at *7 (D. Or. Aug. 4, 1999); that "seriously impair[ ] or destroy[ ]" a building's function, *Sentinel*, 563 N.W.2d at 300; or that render the building unusable or uninhabitable, *see Western Fire Ins. Co.*, 437 P.2d. at 55; *TRAVCO Ins. Co.*, 715 F. Supp. 2d at 709. We agree with these courts and conclude that the term "physical loss" requires a distinct and demonstrable alteration of the insured property.

■ Accordingly, we hold that physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage. These changes, however, must be distinct and demonstrable. Evidence that a change rendered the insured property temporarily or permanently unusable or uninhabitable may support a finding that the loss was a physical loss to the insured property.

■ Here, the plaintiffs asserted that they "experienced a direct physical loss" caused by "toxic odors originating outside of [the unit]." The trial court rejected this assertion. It determined that "direct physical loss requires some tangible alteration of property be proximately caused by a covered occurrence, event, or peril," and concluded that the cat urine odor did not result from a tangible physical alteration of the unit. The trial court also concluded that, even if tangible destruction of property was not required for physical loss, the unit was not "functional[ly] destr[oyed]" because the plaintiffs occupied the unit occasionally and eventually sold it,

thus implying that physical loss requires permanent uninhabitability. Based upon these requirements, the trial court concluded that the odor was not covered under Coverage A and granted summary judgment for Northern on this issue. However, under our construction of "physical loss," the plaintiffs are not required to demonstrate a "tangible physical alteration" to the unit or to prove that the unit was rendered permanently uninhabitable. Rather, to demonstrate a physical loss under Coverage A, they must establish a distinct and demonstrable alteration to the unit. Accordingly, we vacate the trial court's grant of summary judgment in favor of Northern on this issue and remand. We express no opinion as to the outcome of the analysis to be conducted under the legal standard we adopt today; rather, we leave the application of the standard to the trial court in the first instance. *See Pedersen v. Brook*, 151 N.H. 65, 69 (2004).

## B. Pollution Exclusion Clause

The plaintiffs next argue that the trial court erred by concluding that the pollution exclusion clause precludes coverage. The pollution exclusion clause included in the Coverage A endorsement states that Northern does not insure for loss caused by:

> Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.

> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

The plaintiffs assert that their loss is not excluded by the pollution exclusion clause because such exclusions are intended to "exclude coverage for widespread environmental contamination" and "cat urine odor in a condominium unit does not constitute environmental contamination."

Northern argues that the policy language unambiguously defines "pollutants." It further argues that, in the context of this case, the cat urine odor qualifies as a fume or vapor contaminant within the policy's definition of pollutant because the plaintiffs "described the condition as 'a chemical smell similar to ammonia;' 'a toxic odor;' 'noxious odor;' and a 'persistent, pervasive odor,' resulting in the 'toxic contamination of [the unit].' "

The pollution exclusion clause defines "[p]ollutants," in relevant part, as "any . . . irritant or contaminant, including . . . vapor . . . [and] fumes." We

are not persuaded that this definition is sufficient to render the term unambiguous. "As other courts have observed, the terms 'irritant' and 'contaminant' are virtually boundless, for there is no substance or chemical in existence that would not irritate or damage some person or property." *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 30 (1st Cir. 1999) (quotation omitted); *see also American States Ins. Co. v. Koloms*, 687 N.E.2d 72, 78 (Ill. 1997) (recognizing that language of pollution exclusion clause is "quite specific on its face, and yet a literal interpretation of that language results in an application of the clause which is quite broad" (quotations omitted)). "[C]ontaminant," although not defined within the policy, when given its ordinary meaning, is "something which contaminates"; "contaminate," in turn, means to "[m]ake impure by contact or mixture; pollute, corrupt, infect." 1 SHORTER OXFORD ENGLISH DICTIONARY 502 (6th ed. 2007). Similarly, "irritant" means "[a]n irritant substance, body, or agency; a poison etc. which produces irritation"; "irritation," in turn, means, in relevant part, "[t]he production of some active response . . . in an organ, tissue, etc., by the application of a stimulus." *Id.* at 1436.

Applying these definitions in a "purely literal interpretation . . . surely stretch[es] the intended meaning of the policy exclusion," *Nautilus Ins. Co.*, 188 F.3d at 30, and could lead to absurd results "contrary to any reasonable policyholder's expectations," *Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614, 617 (Nev. 2014). For example, "[t]aken at face value, the policy's definition of a pollutant is broad enough that it could be read to include items such as soap, shampoo, rubbing alcohol, and bleach insofar as these items are capable of reasonably being classified as contaminants or irritants." *Id.*; *see also MacKinnon v. Truck Ins. Exchange*, 73 P.3d 1205, 1216 (Cal. 2003) (declining to adopt broad interpretation of pollution exclusion clause to exclude pesticides sprayed for residential extermination, in part because such an interpretation "leads to absurd results"). We, therefore, conclude that the definitional phrase "any . . . irritant or contaminant" is too broad to meaningfully define "pollutant," and thus the word is effectively not defined in the policy.

■ "Where disputed terms are not defined in a policy or by State judicial precedent, we apply an objective standard, construing the terms in context and as would a reasonable person in the position of the insured, based upon more than a casual reading of the policy as a whole." *Panciocco v. Lawyers Title Ins. Corp.*, 147 N.H. 610, 613 (2002). Thus, we consider the overall policy, including the entire pollution exclusion clause, in interpreting the term "pollutants."

We agree with the *Koloms* court, which interpreted similar language, when it observed that the pollution exclusion clause

(i) identifies the types of injury-producing materials which constitute a pollutant, *i.e.*, smoke, vapor, soot, *etc.*, (ii) sets forth the physical or elemental states in which the materials may be said to exist, *i.e.*, solid, liquid, gaseous or thermal, and (iii) specifies the various means by which the materials can be disseminated, *i.e.*, discharge, dispersal, release or escape.

*Koloms*, 687 N.E.2d at 79. We note, however, that "the terms used in the pollution exclusion [clause], such as 'discharge,' 'dispersal,' 'release,' and 'escape,' are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste." *Western Alliance Ins. Co. v. Gill*, 686 N.E.2d 997, 999 (Mass. 1997). Furthermore, in addition to these terms, "the exclusion's definition of 'pollutants' endeavors to particularize the more general words 'irritant or contaminant' by reference to 'smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.' " *Id.* "Each of the latter words brings to mind products or byproducts of industrial production that may cause environmental pollution or contamination." *Id.* As other courts have noted, a reasonable policyholder would not expect these terms to exclude injuries or damage "resulting from everyday activities gone slightly, but not surprisingly, awry." *Pipefitters Welfare Educ. Fund v. Westchester Fire*, 976 F.2d 1037, 1044 (7th Cir. 1992); *see also Western Alliance Ins. Co.*, 686 N.E.2d at 1000.

Moreover, in *Weaver v. Royal Insurance Co. of America*, we found ambiguous a pollution exclusion clause similar to the one at issue here. *See Weaver v. Royal Ins. Co. of America*, 140 N.H. 780, 783 (1996). We held that policy language excluding coverage for injury or damage " 'arising out of the actual, alleged, or threatened discharge, dispersal, release or escape of pollutants' " was ambiguous when applied to the facts of that case and, therefore, did not preclude coverage for the plaintiffs' claims arising from the spread of lead paint chips. *Id.* at 782, 783. We reached this conclusion because, although the policy broadly defined " 'pollutants,' " it did not define the terms, " 'discharge, dispersal, release or escape,' " and the policy language was subject to two reasonable interpretations. *See id.* at 782, 783.

Northern argues that *Weaver* is inapplicable because in that case we did not interpret the term "pollutants" and because *Weaver* was decided in the context of third-party liability insurance. We are not persuaded that these distinctions render our analysis in *Weaver* inapplicable to this case. As noted above, we consider the definition of "pollutants" within the context of the overall policy, including in relation to the terms in the pollution exclusion clause — "discharge, dispersal, release or escape" — that were at issue in *Weaver*. Furthermore, our threshold inquiry — here and in

*Weaver*, regardless of the context of first or third party liability — is whether two parties can reasonably disagree about the meaning of the pollution exclusion clause, rendering it ambiguous. *See id.* at 783; *Barking Dog*, 164 N.H. at 84.

Pollution exclusion clauses are standard insurance provisions, that have "been heavily litigated in numerous . . . jurisdictions, resulting in conflicting outcomes." *Century Sur. Co.*, 329 P.3d at 617. Some courts interpret pollution exclusion clauses, as the plaintiffs here propose, to bar "coverage for only those injuries allegedly caused by traditional environmental pollution." *State Farm Fire & Casualty Co. v. Dantzler*, 852 N.W.2d 918, 923 & n.23 (Neb. 2014) (citing cases). "Other courts interpret pollution exclusions as excluding coverage for all injuries allegedly caused by pollutants, because the exclusions are unambiguous as a matter of law." *Id.* at 923 & n.24 (citing cases). As we concluded in *Weaver*, "[b]oth interpretations . . . are reasonable" and, therefore, "[b]ecause there are two reasonable interpretations of the policy language, we conclude that the pollution exclusion [clause] is ambiguous." *Weaver*, 140 N.H. at 783.

■ "When policy language is ambiguous, the language subject to different interpretations is construed in favor of the insured, and the insured's reasonable expectations of coverage are considered." *Titan Holdings Syndicate v. City of Keene, N.H.*, 898 F.2d 265, 270 (1st Cir. 1990); *see also Trombly v. Blue Cross/Blue Shield*, 120 N.H. 764, 770-72 (1980). Northern focuses on the terms "fumes" and "vapor" in the definition of "pollutants" to argue that the pollution exclusion clause contemplated cat urine odor and, therefore, that the reasonable expectations of the insured exclude coverage. However, the cases it cites to support this position deal with industrial or commercial facilities and not "everyday activities gone slightly . . . awry." *Pipefitters*, 976 F.2d at 1044. For example, *Travelers Property Casualty Co. of America v. Chubb Custom* involved a suit alleging "harmful and ill-smelling odors, hazardous substances and contaminated wastewater" that "escape[d]" onto nearby properties from a 2,800-sow production facility in which pig excrement was collected and stored in a large pit. *Travelers Property Cas. Co. of Am. v. Chubb Custom*, 864 F. Supp. 2d 301, 305 (E.D. Pa. 2012) (quotation omitted). Similarly, *Wakefield Pork, Inc. v. Ram Mutual Insurance Co.*, dealt with allegations of "extremely noxious and offensive odors and gases" from a nearby pig-feeding operation that stored and spread more than one million gallons of manure. *Wakefield Pork, Inc. v. Ram Mut. Ins. Co.*, 731 N.W.2d 154, 157 (Minn. Ct. App. 2007) (quotation omitted). In *City of Spokane v. United National Insurance Co.*, the court concluded that an average policy purchaser would have understood that the pollution exclusion clauses at issue excluded coverage for

liability arising from odors that met the local regulatory definitions of "air contaminant" and were emitted by a compost facility that was registered as an "air contaminant source." *City of Spokane v. United Nat. Ins. Co.*, 190 F. Supp. 2d 1209, 1219-20 (E.D. Wash. 2002); *see also Kruger Commodities, Inc. v. U.S. Fidelity and Guar.*, 923 F. Supp. 1474, 1476, 1479 (M.D. Ala. 1996) (concluding that reasonable person would have understood that pollution exclusion clause included odors produced by processing animal carcasses at nearby plant).

Although an insured may have reasonably understood that the pollution exclusion clause precluded coverage for damages resulting from odors emanating from large-scale farms, waste-processing facilities, or other industrial settings, these circumstances are distinguishable from those before us, which involve an odor created in a private residence by common domestic animals. *See Western Alliance Ins. Co.*, 686 N.E.2d at 999 (recognizing that "an insured could reasonably have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence" (quotation omitted)). In addition, although Northern emphasizes that the plaintiffs referred to the cat urine odor as "a chemical smell similar to ammonia," we do not believe that the reference to "ammonia" in this context triggers the pollution exclusion clause. Admittedly, some courts have concluded that ammonia is a pollutant within the meaning of similar pollution exclusion clauses. *See, e.g., Deni Associates v. State Farm Ins.*, 711 So. 2d 1135, 1136, 1140-41 (Fla. 1998) (concluding that pollution exclusion clause was unambiguous and excluded from coverage ammonia spilled from blueprint machine because ammonia is "a colorless, gaseous alkaline compound which is extremely pungent in smell" and "an extremely hazardous substance, the release of which is known to have serious adverse effects to human health"); *Union Ins. Co. v. Mendoza*, 405 Fed. Appx. 270, 276 (10th Cir. 2010) (ammonia fertilizer). These cases, however, involved chemical spills that may more readily be within the insured's reasonable expectations of the exclusion than is the ammonia-like smell of cat urine. Furthermore, not all courts addressing ammonia spills have concluded that the pollution exclusion clause precluded coverage. *See SEMX Corp. v. Federal Ins. Co.*, 398 F. Supp. 2d 1103, 1121 (S.D. Cal. 2005) (denying summary judgment for insurer regarding breach of contract cause of action with respect to third party claims because pollution exclusion clause did not bar coverage for claims arising out of accidental release of ammonia). Consequently, we hold that the pollution exclusion clause is ambiguous when applied to the facts of this case and, as such, does not preclude coverage for the plaintiffs'

claims. *See Trombly*, 120 N.H. at 770-72. Accordingly, the trial court's decision regarding this issue is reversed.

*IV. Coverage D*

Finally, the plaintiffs argue that the trial court misinterpreted the policy and erroneously concluded that Coverage D provides coverage only when the loss of use of the property results from an identified peril in the policy. They argue that the plain language of the policy, including an endorsement expanding the scope of coverage under Coverage D to include "loss[es] covered under this Section," does not require that the alleged loss be attributable to one of the sixteen enumerated perils in the main policy. Northern asserts that the plaintiffs have waived their right to present this argument on appeal because they did not first make it before the trial court in opposition to the motion for summary judgment.

 We generally do not consider issues raised on appeal that were not presented to the trial court. *In the Matter of Nassar & Nassar*, 156 N.H. 769, 780 (2008). This preservation requirement recognizes that, ordinarily, trial courts should have an opportunity to rule upon issues and to correct errors before they are presented to the appellate court. *Id.* Here, Northern's motion for summary judgment asked the trial court to interpret Coverage D by asserting that coverage under that provision was limited to losses caused by the enumerated perils. The trial court ruled on this issue, concluding that none of the perils includes odors. Thus, on Northern's request, the trial court interpreted the precise language that is before us. That the plaintiffs now posit an interpretation not articulated before the trial court is of no consequence. *See Mutrie*, 167 N.H. at 111 (recognizing that interpretation of insurance policy language is question of law). We interpret insurance policy language *de novo*, *Cogswell Farm Condo. Ass'n*, 167 N.H. at 248, and, therefore, are unconstrained by the specific arguments ·presented to the trial court. Accordingly, we conclude that the interpretation of Coverage D is properly before us.

Coverage D, which insures against the loss of use of the covered property, contains two provisions that are relevant here. The main policy describes coverage under the first of these provisions as follows:

> 1. If a loss by a *Peril Insured Against* under this policy to covered property or the building containing the property, makes the "residence premises" not fit to live in, we cover ... either ... **Additional Living Expense ... or ... Fair Rental Value.**

(Emphasis added). However, an endorsement, which includes special provisions for New Hampshire, modifies this provision, stating:

## COVERAGE D — LOSS OF USE

Item 1. is deleted and replaced by the following:

1. If a loss covered under this *Section [I]* makes that part of the "residence premises" where you reside not fit to live in, we cover the Additional Living Expense . . . .

(Emphasis added.) The second relevant provision of Coverage D, included in the main policy and not amended by the endorsement, states:

2. If a loss covered under this *Section [I]* makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the: **Fair Rental Value** . . . .

(Emphasis added.) Thus, neither provision limits coverage to losses attributable to one of the enumerated perils. Rather, they provide coverage for losses "covered under this Section [I]." Because Coverage D is in Section I, as is Coverage A, the plaintiffs are entitled to coverage under Coverage D if their losses are covered under Coverage A.

To determine whether there is coverage for the plaintiffs' alleged losses under Coverage A, we look to the main policy as amended by the Coverage A endorsement. The main policy limits losses covered under Section I to direct physical loss caused by sixteen enumerated perils. However, the endorsement to Coverage A eliminated the enumerated "Perils Insured Against" and described coverage as:

Perils Insured Against

We insure against risk of direct loss to property described in Coverage A, only if that loss is a physical loss to property.

Thus, coverage under Coverage A is dependent upon whether the loss is a "physical loss." Because we have vacated the trial court's decision that the plaintiffs did not suffer a "physical loss," and were, therefore, not entitled to coverage under Coverage A, we also vacate the trial court's ruling that Northern was entitled to judgment as a matter of law with regard to Coverage D, and remand for further proceedings consistent with this opinion.

*Vacated in part; reversed in part; and remanded.*

BASSETT, J., and ARNOLD, J., retired superior court justice, specially assigned under RSA 490:3, concurred; LYNN, J., with whom DALIANIS, C.J., joined, dissented.

LYNN, J., dissenting. Because I believe that cat urine unambiguously falls within the terms of the insurance policy's pollution exclusion clause, I would affirm the trial court's ruling that this clause precludes coverage for the plaintiffs' claims. Therefore, I respectfully dissent.

The pollution exclusion clause states that Northern does not insure against loss caused by:

> Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.[1]

The clause contains a specific definition of "pollutants":

> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

The ordinary meaning of contaminant, as stated by the majority, is "something which contaminates." 1 SHORTER OXFORD ENGLISH DICTIONARY 502 (6th ed. 2007). "Contaminate" means to "[m]ake impure by contact or mixture; pollute, corrupt, infect." *Id.* "Infect," in turn, means to "[c]ontaminate (air, water, etc.) with harmful organisms or noxious matter; make harmful to health"; and to "affect or impregnate with a (freq. noxious) substance; taint." *Id.* at 1375. And finally, "taint" means to "[a]ffect, esp. to a slight degree; imbue slightly *with* some bad or undesirable quality." 2 SHORTER OXFORD ENGLISH DICTIONARY 3166 (6th ed. 2007).

The cat urine at issue in this case fits squarely within the plain and ordinary meaning of contaminant, and is thus a "pollutant" as defined in the pollution exclusion clause. The cat urine was described as "a chemical smell similar to ammonia"; "a noxious odor"; and a "persistent, pervasive odor" that resulted in the "toxic contamination" of the apartment. Based upon these descriptions, it is clear that the cat urine, a noxious substance, imbued the plaintiffs' apartment with a bad or undesirable quality — the chemical-like, noxious odor of cat urine. A health inspector also advised the plaintiffs to vacate the apartment due to health risks, which shows that the cat urine contaminated the air in the apartment to the extent that it made it harmful to health. In short, the cat urine plainly qualifies as a pollutant as defined by the pollution exclusion clause.

Because the term "pollutant" is unambiguously defined within the policy in clear language, I would not look beyond the policy language in

---

[1] Neither party contends that cat urine is a Peril Insured Against under Coverage C of the policy.

determining that the plaintiffs' claims are precluded by the pollution exclusion clause. *See Barking Dog*, 164 N.H. at 83-84. This approach is in keeping with the rulings of many courts, which likewise interpret pollution exclusion clauses by looking to the plain meaning of the terms as defined in the text of such clauses. *See, e.g., United Fire & Cas. v. Titan Contractors Service*, 751 F.3d 880, 884 (8th Cir. 2014); *American States Ins. Co. v. Nethery*, 79 F.3d 473, 475-76 (5th Cir. 1996); *Mountain States Mut. Cas. Co. v. Roinestad*, 296 P.3d 1020, 1024-25 (Colo. 2013); *Bituminous Cas. v. Sand Livestock Systems*, 728 N.W.2d 216, 221 (Iowa 2007); *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 637 (Minn. 2013); *State Farm Fire & Casualty Co. v. Dantzler*, 852 N.W.2d 918, 925 (Neb. 2014); *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 329-30 (Va. 2012); *Peace v. Northwestern Nat. Ins.*, 596 N.W.2d 429, 438-39 (Wis. 1999).

The majority, on the other hand, states that a "purely literal interpretation" of pollutant, as defined within the exclusion clause, would "stretch the intended meaning of the policy exclusion" and potentially lead to absurd results. *Supra* at 552; *see Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614, 617 (Nev. 2014). It points out that such everyday objects as "soap, shampoo, rubbing alcohol, and bleach" could be considered pollutants under a plain reading of the statutory language. *Supra* at 552; *see Century Sur. Co.*, 329 P.3d at 617. Accordingly, the majority concludes that the "definitional phrase 'any . . . irritant or contaminant' is too broad to meaningfully define pollutant within the policy." *Supra* at 552.

But merely because the exclusion is *broad* does not mean that it eludes definition and is thus *ambiguous*, and it is ambiguity, not breadth, that provides the license for us to look beyond the policy's text. "The pertinent inquiry is not . . . whether the policy's definition of 'pollutant' is so broad that virtually any substance . . . could be said to come within its ambit." *Madison Const. v. Harleysville Mut. Ins.*, 735 A.2d 100, 107 (Pa. 1999). "Rather, guided by the principle that ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts, we focus on the specific product at issue." *Id.* That many items could satisfy the definition of "pollutant" does not change the fact that this term is clearly *defined* in the policy, making it improper to set aside the policy's language in order to redefine the term using outside sources. *See Landshire Fast Foods v. Employers Mut. Cas.*, 676 N.W.2d 528, 532 (Wis. Ct. App. 2004) ("[A]lthough various forms of matter can constitute contamination, the term is not itself reasonably susceptible to multiple meanings." (quotation omitted)); *see also Weaver v. Royal Ins. Co. of America*, 140 N.H. 780, 782 (1996) ("Where disputed terms are *not defined* in the policy . . . we construe them in context and in the light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." (quotation omitted;

emphasis added)). Because "pollutant" is clearly defined in the policy, and thus not ambiguous, this court's analysis should be limited to the terms of the policy. *See White v. Vermont Mutual Insurance Co.*, 167 N.H. 153, 157 (2014).

Because the majority reaches the contrary conclusion that the term "pollutant" is undefined, it relies upon case law which reasons that *other* terms used in the pollution exclusion clause, "such as 'discharge,' 'dispersal,' 'release,' and 'escape,' are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste." *Western Alliance Ins. Co. v. Gill*, 686 N.E.2d 997, 999 (Mass. 1997). The meaning of those same terms was at issue in *Weaver*, the case upon which the majority relies to conclude that the term "pollutant" is ambiguous. *See Weaver*, 140 N.H. at 782.

In *Weaver*, the court did not rely upon the plain and ordinary meaning of "discharge," "dispersal," "release" and "escape" in its analysis, despite the fact that these terms are in everyday usage in the English language and readily susceptible of simple dictionary definitions.[2] Instead, the court resorted to extraneous sources — specifically, *its understanding of the historical genesis of pollution exclusion clauses as a response to environmental litigation beginning in the 1970s* — as indicative of an intent to exclude from coverage only claims of traditional environmental pollution. *Id.* at 782-83; *see Century Sur. Co.*, 329 P.3d at 617; *Wolters*, 831 N.W.2d at 635 (citing cases). Seemingly guided by this history, it concluded that the terms "discharge," "dispersal," "release" and "escape" were ambiguous.[3]

---

[2] "Discharge" is defined as follows: "release *from*"; "[t]he act of sending or pouring out; ejection; (the rate or amount of) emission." 1 SHORTER OXFORD ENGLISH DICTIONARY 696-97 (6th ed. 2007). "Dispersal" means "[t]he action of dispersing"; to "disperse," in turn, means to "[d]rive, throw, or send in different directions; scatter, rout"; "[c]ause (esp. something unpleasant) to disappear; dispel, dissipate." *Id.* at 710. "Escape" is to "leak or seep out; pass out. Of an object: come out (as if) from confinement." *Id.* at 861-62. And "release" means to "[s]et or make free"; "allow to move, drop, or operate, by removing a restraining part; let go." 2 SHORTER OXFORD ENGLISH DICTIONARY 2520 (6th ed. 2007).

[3] Under the reasoning of the courts that find the pollution exclusion clause ambiguous, if the plaintiffs' residence had been contaminated by fumes from a leaking gasoline storage tank of a commercial filling station located next door to their property, presumably this would constitute traditional environmental pollution for which coverage would be barred under the pollution exclusion clause. But if instead the fumes emanated from a leaking heating oil tank located in the basement of the plaintiffs' own property, or a leaking gas tank of a vehicle parked in the plaintiffs' garage, coverage would be available. It is impossible to justify such disparate results based upon the plain meaning of the language used in the pollution exclusion clause. The Supreme Court of Minnesota has acknowledged this troubling potential for inconsistent results, stating, "as attractive as it might be to use the 'traditional environmental pollution' definition as a route to compensation for the injured parties, that formulation has its own risks and complications." *Wolters*, 831 N.W.2d at 638. The fact that the appellants did "not propose a definition of 'traditional environmental pollution,'" combined with the "significant pressure on the . . . government to expand the definition of what constitutes 'pollution,'" led

*Weaver*, 140 N.H. at 782-83. However, "the mere fact that parties disagree on the meaning of terms does not establish ambiguity." *Sand Livestock Systems*, 728 N.W.2d at 221 (quotation omitted); *see also Landshire Fast Foods*, 676 N.W.2d at 532. "An ambiguity exists only if the language of the exclusion is susceptible to two interpretations." *Sand Livestock Systems*, 728 N.W.2d at 222 (quotation omitted). "We may not refer to extrinsic evidence in order to create ambiguity. Instead, we must enforce unambiguous exclusions as written." *Id.* (citations omitted).

Nothing in the plain and unambiguous language of the pollution exclusion clause supports the *Weaver* court's conclusion that these terms are meant to be defined as environmental terms of art. *See Dantzler*, 852 N.W.2d at 925 ("The language of the policy does not specifically limit excluded claims to traditional environmental damage; nor does the pollution exclusion purport to limit materials that qualify as pollutants to those that cause traditional environmental damage." (quotation omitted)); *Sand Livestock Systems*, 728 N.W.2d at 221 ("[T]he plain language of the exclusions at issue here makes no distinction between 'traditional environmental pollution' and injuries arising from normal business operations."). Thus, it is difficult to justify the *Weaver* court's conclusion that these terms are ambiguous and could be reasonably read as so-called "environmental terms of art," when the court itself created the ambiguity by resorting to outside sources, rather than the plain language, to define the terms. The majority extends *Weaver*'s dubious reasoning by applying it to this case, in which the term at issue — "pollutant" — is specifically defined in the policy. By relying upon *Weaver*'s analysis to conclude that the term "pollutant" is ambiguous, the majority likewise ignores the plain language of the policy and creates ambiguity where none exists.

Denying coverage here might be thought to produce an unfortunate result, but in my view it is the result that a correct application of the law demands. "Were we in a position to construe ambiguous policy language, we would indeed prefer an interpretation that avoided harsh or unreasonable results." *Catholic Med. Ctr. v. Executive Risk Indem.*, 151 N.H. 699, 702 (2005). "[W]hile we have the duty to construe an insurance contract in a reasonable manner, we are not free to rewrite its terms by giving them a meaning which they never had." *Id.* (quotation and brackets omitted). "[W]hen a policy's meaning and intent are clear, it is not the prerogative of the courts to create ambiguities where none exist or to rewrite the contract in attempting to avoid harsh results." *Id.* at 703 (quotation omitted). I share the view of the Supreme Court of Minnesota that if the pollution exclusion

---

the court to conclude that "[t]he likely result of adopting the formulation urged by appellants would be inconsistency in determining when the absolute exclusion applies." *Id.*

clause is regarded as overly broad, the remedy must be found in the market place or through legislative action rather than through creative judicial construction of clear policy language. *See Wolters*, 831 N.W.2d at 638.

For the reasons stated above, I respectfully dissent.

DALIANIS, C.J., joins in this dissent.