NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2016-0390


MASSACHUSETTS BAY INSURANCE COMPANY

v.

AMERICAN HEALTHCARE SERVICES ASSOCIATION & a.

Argued: March 1, 2017
Opinion Issued: September 28, 2017

Preti Flaherty Beliveau & Pachios, PLLP, of Concord (William C. Saturley on the brief), and Hangley Aronchick Segal Pudlin & Schiller, of Philadelphia, Pennsylvania (Ronald P. Schiller and Daniel J. Layden on the brief, and Mr. Schiller orally), for Arch Specialty Insurance Company.

Mallory & Friedman, PLLC, of Concord (Mark L. Mallory on the brief and orally), for Triage Staffing, Inc.

Sheehan Phinney Bass & Green, PA, of Manchester (James Q. Shirley and Megan C. Carrier on the brief, and Mr. Shirley orally), for Exeter Hospital, Inc.

LYNN, J.  Defendant Arch Specialty Insurance Company (Arch) appeals multiple orders of the Superior Court (McHugh and Anderson, JJ.), granting summary judgment to defendants Triage Staffing, Inc. (Triage), Exeter Hospital, Inc. (Exeter), and American Healthcare Services Association (AHSA) on their petitions for declaratory judgment, and denying Arch's cross-motion for summary judgment.  The court ruled that Arch is required to defend and indemnify Triage, Exeter, and AHSA, pursuant to two insurance policies that Arch issued to Triage, for claims asserted against the defendants by patients of Exeter who contracted Hepatitis C (Exeter Patients).  On appeal, Arch argues that the trial court erred in finding inapplicable certain exclusions found in the insurance policies and in determining that the claims involved multiple occurrences under the policies.  We affirm in part, reverse in part, vacate in part, and remand.

I

In light of the arguments raised, it is important to state the facts and procedure in some detail.  The pertinent facts of this case arise from the conduct of David Kwiatkowski, a cardiac catheter laboratory technician who was infected with the Hepatitis C virus.  While working at Exeter, Kwiatkowski diverted opioid drugs to his own use and, after injecting himself with such drugs, returned the contaminated needles to the hospital's supply, where they were used in the treatment of numerous patients, some of whom contracted Hepatitis C.  Exeter is a member of AHSA, a company that accredits and grades people in the healthcare industry.  Exeter and AHSA contracted with Triage, a staffing company that places medical personnel in medical facilities across the country.  Pursuant to these contracts, Triage placed Kwiatkowski at Exeter.

In the wake of Kwiatkowski's actions, the Exeter Patients sued Triage, Exeter, and AHSA.  Some of those suits have settled, while others have not.  Triage, Exeter, and AHSA each carry insurance through a different insurance company: Arch primarily insures Triage; Hanover Insurance Company primarily insures Exeter; and Massachusetts Bay Insurance Company (MBIC) primarily insures AHSA.  This appeal chiefly concerns whether and to what extent the policies that Arch issued to Triage provide coverage to Triage, as a named insured, and to Exeter and AHSA, as additional insureds.

In 2008, Triage and AHSA entered into a staffing agreement.  Triage agreed to provide temporary workers to AHSA member hospitals, such as Exeter, and to screen the qualifications and competence of those temporary workers.  Additionally, Triage agreed to indemnify AHSA and AHSA member hospitals and to maintain certain minimum coverage of employers' liability insurance, professional liability insurance, and comprehensive general liability insurance.

To that end, Triage purchased two relevant policies from Arch: one policy providing coverage from January 1, 2011, to January 1, 2012, and a second policy providing coverage from January 1, 2012, to January 1, 2013. Except for the coverage periods, the policies are identical. Each policy includes three different coverage forms: professional liability; general liability; and umbrella liability, which covers both professional and general liability.

Pursuant to the AHSA staffing agreement, Triage placed Kwiatkowski at Exeter Hospital on April 1, 2011. On or about October 16, 2011, Exeter hired Kwiatkowski, at which point he ceased to be a Triage employee. Kwiatkowski continued to work for Exeter until the hospital placed him on administrative leave on May 21, 2012, and subsequently terminated him on June 29, 2012.

During his time at Exeter, Kwiatkowski worked in the cardiac catheterization lab, where patients undergo invasive procedures. As part of the procedures, patients are often administered two drugs: fentanyl and versed. In preparation for a procedure, nurses and physicians remove the drugs from a secure machine. Kwiatkowski was neither authorized to access the machine nor authorized to administer the drugs. In connection with his plea of guilty to federal criminal charges, Kwiatkowski admitted in federal court that, on approximately 50 occasions, prior to a medical procedure, he swapped syringes containing fentanyl for syringes that he had filled with saline. After injecting himself with fentanyl from diverted syringes, Kwiatkowski refilled the now contaminated syringes with saline to cover the diversions. Because Kwiatkowski was infected with Hepatitis C, these saline syringes were tainted with the virus. When the Exeter Patients were subsequently injected with the saline syringes, some of them became infected.

The Exeter Patients sued Triage for Kwiatkowski's actions based upon the doctrine of respondeat superior, as well as for its alleged direct negligence in hiring, employing, training, and supervising him. They sued Exeter for medical negligence; for negligently hiring, employing, training, and supervising Kwiatkowski; for negligent or intentional infliction of emotional distress; and for willful or knowing violation of the New Hampshire Consumer Protection Act, RSA chapter 358-A (2009 & Supp. 2016).

MBIC initiated the present action in February 2013 when it petitioned for a declaratory judgment to determine the scope of coverage available to AHSA under the Arch and MBIC policies.[1] Triage and Exeter each filed a cross-claim for declaratory judgment that Arch was required to provide them a defense and indemnity. Arch filed a counterclaim for declaratory judgment that MBIC was the primary insurer responsible for defense and indemnity of AHSA and cross-claims for declaratory judgment that Arch owed no duty to defend or indemnify Triage, Exeter, and AHSA. The Exeter Patients filed a counterclaim for

---

[1] Exeter's insurer, Hanover Insurance Company, is not a party to this action.

declaratory judgment that MBIC was obligated to provide coverage to AHSA and a cross-claim for declaratory judgment that Arch was obligated to provide coverage to Triage, Exeter, and AHSA.[2]

Thereafter, the parties filed numerous motions for summary judgment, motions for partial summary judgment, cross-motions for summary judgment, objections, and responses, all of which led to a series of trial court orders. In January 2014, the trial court issued an order ruling that the Arch policies' exclusion for "abuse or molestation" did not bar coverage. In April 2014, the trial court issued two orders. In the first order, it ruled that the Arch policies' exclusion for "dishonest, fraudulent, malicious, uninsurable acts" did not bar coverage based upon Exeter's conduct, with the ruling subject to reexamination at the close of discovery. The second order required Arch to contribute equally with MBIC to Exeter's past and future defense costs, subject to Arch's right to seek reimbursement of defense costs at the close of the litigation.

Exeter moved for reconsideration of the trial court's ruling that MBIC was required to share Exeter's defense costs with Arch. In May 2014, the court denied Exeter's motion and issued an order ruling that: (1) Arch was not judicially estopped from asserting that coverage under its policies should be determined under the professional liability coverage form, not the general liability coverage form; (2) the underlying acts triggered the Arch policies' general liability coverage form; (3) the underlying acts constituted multiple occurrences under the Arch policies; (4) the underlying acts covered both the 2011 and 2012 Arch policies; (5) the Arch policies' umbrella coverage form provided coverage to both Exeter and AHSA; and (6) Arch's policies and MBIC's policies equally provided primary, rather than excess, coverage to AHSA.

Exeter, MBIC, and Arch all filed motions for reconsideration. In June 2014, the trial court: (1) reaffirmed its prior ruling that neither the Arch policies nor the MBIC policies were in excess of the other's policies; (2) ruled the Arch policies' exclusion for "dishonest, fraudulent, malicious, uninsurable acts" did not bar coverage based upon Kwiatkowski's conduct; and (3) ruled that the Arch policies' general liability coverage form exclusion for "healthcare professional services" did not bar coverage, with the ruling subject to reexamination at the close of discovery.

In July 2014, Arch appealed the trial court's coverage rulings to this court. We dismissed Arch's appeal as an improper interlocutory appeal because the court's orders did not finally resolve all issues among all parties.

In May 2016, the trial court issued an order finalizing its grant of summary judgment against Arch and in favor of Triage, Exeter, and AHSA in

---

[2] In June 2013, the trial court dismissed the Exeter Patients' cross-claim against Arch for lack of standing.

accordance with its prior orders. The court also ruled that, because Triage, Exeter, and AHSA were the prevailing parties, they were entitled to their costs and reasonable attorney's fees from Arch pursuant to RSA 491:22-b (2010).

Arch subsequently filed the present appeal.[3] On appeal, Arch argues that the trial court erred by granting summary judgment in favor of Triage and Exeter because: (1) three exclusions barred coverage under the general liability coverage form; (2) two exclusions barred coverage under the umbrella coverage form; and (3) the underlying actions constitute only a single occurrence under the policies. Additionally, although Exeter did not file a notice of cross-appeal, it now asks us to consider the issue of Arch's obligation to contribute to Exeter's defense costs.

II

In reviewing a trial court's rulings on cross-motions for summary judgment, we "consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law." Conant v. O'Meara, 167 N.H. 644, 648 (2015) (quotation omitted). "If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment." Id. (quotation omitted). "We review the trial court's application of the law to the facts de novo." Id. (quotation omitted).

"In a declaratory judgment action to determine the coverage of an insurance policy, the burden of proof is always on the insurer, regardless of which party brings the petition." Cogswell Farm Condo. Ass'n v. Tower Group, Inc., 167 N.H. 245, 248 (2015) (quotation omitted); see RSA 491:22-a (2010). "The interpretation of insurance policy language is a question of law for this court to decide." Cogswell Farm, 167 N.H. at 248 (quotation omitted). "We review questions of law de novo." Id. (quotation omitted). "We first look to the plain and ordinary meaning of the policy's words in context, and we construe the terms of the policy as would a reasonable person in the position of the insured based on more than a casual reading of the policy as a whole." Id. (quotation omitted). "This is an objective standard." Id. (quotation omitted).

"Insurers are free to contractually limit the extent of their liability through use of a policy exclusion, provided it violates no statutory provision." Progressive N. Ins. Co. v. Concord Gen. Mut. Ins. Co., 151 N.H. 649, 653 (2005) (citations omitted). "Such language must be so clear, however, as to create no ambiguity that might affect the insured's reasonable expectations." Id. (quotation omitted). "In determining whether an ambiguity exists, we look to

---

[3] AHSA, MBIC, and the Exeter Patients are not participating in this appeal.

the claimed ambiguity, consider it in its appropriate context, and construe the words used according to their plain, ordinary, and popular definitions." Id. (quotation omitted). "Policy terms create an ambiguity when the parties may reasonably differ about the interpretation of the language." Id. "Ultimately, we interpret exclusion language to mean what a reasonable person would construe it to mean." Id. (quotation omitted). "The insurer asserting an exclusion of coverage . . . bears the burden of proving that the exclusion applies." Id.

A

Arch first argues that the "healthcare professional services" exclusion in the general liability coverage form excludes coverage. Arch contends that the exclusion bars coverage for claims that allege damage resulting from the provision of medical services, regardless of whether Triage performed those medical services. Triage argues that the exclusion only bars coverage if damage resulted from medical services that it performed. Thus, Triage argues that because the Exeter Patients allege that Triage negligently hired and supervised Kwiatkowski, but not that Triage performed medical services, the exclusion does not apply. Exeter argues that its own coverage is derivative of Triage's coverage; thus, it contends, the exclusion applies to Exeter only if Triage performed medical services.[4]

The healthcare professional services exclusion provides that the insurance does not apply to any claim that alleges "'Bodily injury' or 'property damage' that result[s] from the performance of or failure to perform 'health care professional services.'"[5] The policy defines "Health care professional services" to include, as relevant: "Medical, surgical, dental, x-ray, nursing, mental, or similar 'health care professional services' or treatments" and "[p]roviding or dispensing of food, beverages, medications or medical supplies or appliances in connection with [the foregoing] services."

According the words their plain and ordinary meanings, we conclude that the healthcare professional services exclusion plainly applies to any claim that alleges bodily injury that results from the provision of medical services, regardless of whether Triage performed those services. Contrary to Triage's and Exeter's interpretations, the exclusion is not restricted to situations in which Triage provided the medical services. The exclusion sets forth a type of harm for which coverage is excluded: bodily injury that results from the provision of medical services. That is precisely the type of harm that occurred in this case: the Exeter Patients' claims allege a bodily injury (their infection with Hepatitis C) that resulted from a medical procedure (their injection with tainted medication). Accordingly, the healthcare professional services

---

[4] In addition to raising their own arguments, Exeter and Triage each join in the other's arguments.
[5] Neither Triage nor Exeter argues that the Exeter Patients did not allege "bodily injury."

6

exclusion bars coverage under the general liability coverage form for the Exeter Patients' claims.

Triage and Exeter alternatively argue that the healthcare professional services exclusion is ambiguous as to whether it applies only when Triage performs the medical services, and that the ambiguity must be construed in favor of coverage. They contend that Arch could have specified that the exclusion applies regardless of who performs the medical services and that its failure to do so makes the exclusion ambiguous.

We find no ambiguity in the healthcare professional services exclusion. The provision plainly applies to any claim that alleges bodily injury that results from the performance of healthcare professional services. Although Arch could have added language stating that the exclusion applies regardless of who performs the medical services, it did not need to do so because no part of the exclusion's language suggests in any way that the exclusion is limited to circumstances in which Triage itself performs the medical services. We will not manipulate the exclusion's language in an effort to create an ambiguity. See Trombly v. Blue Cross/Blue Shield, 120 N.H. 764, 770-71 (1980); see also Colony Ins. Co. v. Dover Indoor Climbing Gym, 158 N.H. 628, 630-31 (2009) (When "policy language is clear, this court will not perform amazing feats of linguistic gymnastics to find a purported ambiguity simply to construe the policy against the insurer and create coverage where it is clear that none was intended."). As discussed above, the exclusion sets forth a type of harm for which coverage is excluded — bodily injury or property damage resulting from the performance or failure to perform health care professional services; the exclusion contains no language indicating that who performs or fails to perform the health care professional services is a relevant consideration that bears upon its applicability.

Exeter and Triage next argue that the above interpretation of the healthcare professional services exclusion renders the "separation of insureds" clause in the policy meaningless, and, therefore, we must interpret the exclusion to apply only when Triage performs the medical services that resulted in bodily injury. The separation of insureds clause, which is contained within an endorsement that affects all three of the insurance coverage forms, provides:

> Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this endorsement to the first Named Insured, this insurance applies:
>
> a.  As if each Named Insured were the only Named Insured; and
>
> b.  Separately to each insured against whom 'claim' is made or 'suit' is brought.

Triage points to numerous cases that interpret insurance exclusions that contain the phrases "the insured," "an insured," and "any insured" in light of a "separation of insureds" or "severability of insurance" clause. If a policy containing a separation of insureds clause provides that coverage is excluded if "the insured" takes a specific action, courts look at the conduct of the insured who is seeking coverage, rather than the conduct of the other insureds, to determine if the exclusion applies. See McCauley Enterprises v. New Hampshire Ins. Co., 716 F. Supp. 718, 720-21 (D. Conn. 1989) (interpreting a policy containing a separation of insureds clause and holding that, because the phrase "the insured" in an exclusion "evidences [an] intention that the obligations be several rather than joint," such an exclusion does not bar coverage to innocent insureds based upon the conduct of a co-insured). If, on the other hand, a policy containing a separation of insureds clause provides that coverage is excluded if "an insured" or "any insured" takes a specific action, some courts apply the exclusion when any one insured took the action, while other courts apply the exclusion only if the insured who is seeking coverage took the action. Compare id. at 721 (interpreting a policy containing a separation of insureds clause and holding that "[t]he language 'any insured' has been consistently interpreted as expressing a contractual intent to create joint obligations and to prohibit recovery by an innocent co-insured"), Chacon v. American Family Mut. Ins. Co., 788 P.2d 748, 751-52 (Colo. 1990) (holding that the phrase "any insured" in an exclusion "unambiguously expresse[d] a contractual intent to create joint obligations and to prohibit recovery by an innocent co-insured" and rejecting the argument that this interpretation rendered a separation of insureds clause meaningless), and Co-operative Ins. Companies v. Woodward, 45 A.3d 89, 94 (Vt. 2012) (noting that there is no meaningful difference between the terms "an insured" and "any insured," and holding that "such language has a collective effect and bars all insureds from coverage" even if the policy contains a separation of insureds clause), with Minkler v. Safeco Ins. Co. of America, 232 P.3d 612, 614 (Cal. 2010) (holding that "an exclusion of coverage for the intentional acts of 'an insured,' read in conjunction with a severability . . . clause like the one at issue here, creates an ambiguity which must be construed in favor of coverage"), and Worcester Mut. Ins. Co. v. Marnell, 496 N.E.2d 158, 161 (Mass. 1986) (holding that a severability of insurance clause would be rendered meaningless if an exclusion that applied based on the conduct of "any insured" barred coverage to an innocent insured based on the conduct of a co-insured).

However, as Triage acknowledges, the phrases "the insured," "an insured," and "any insured" are not at issue in the healthcare professional services exclusion. Instead, the exclusion is plainly written to exclude coverage of claims that allege bodily injury that results from the provision of medical services, without regard for whether an insured provided the medical services. It does not matter if the medical services were provided by "the insured," "an insured," "any insured," or even by a person who is not an insured. Simply put, if a claim alleges bodily injury that resulted from the provision of medical

8

services, the general liability coverage form excludes coverage for that claim. Because that is precisely what occurred in this case, the general liability coverage form provides no coverage.

Furthermore, this interpretation does not render the separation of insureds clause meaningless, as Triage argues. The general liability coverage form contains other exclusions that apply based on conduct of "the insured" or "any insured." Because the separation of insureds clause can affect these other exclusions, it is not rendered meaningless simply because it does not also affect the healthcare professional services exclusion. See Michael Carbone, Inc. v. General Acc. Ins. Co., 937 F. Supp. 413, 422-23 (E.D. Pa. 1996) (finding that a separation of insureds clause which did not modify one exclusion was not meaningless because it modified other exclusions); see also McCauley Enterprises, 716 F. Supp. at 720-21 (interpreting a policy containing a separation of insureds clause and holding that an exclusion that barred coverage for conduct of "the insured" did not apply to an innocent insured based upon the conduct of a co-insured while a second exclusion that barred coverage for conduct of "any insured" did apply).[6]

Exeter and Triage next argue that the healthcare professional services exclusion should not apply to the Exeter Patients' claims that Triage negligently hired, employed, trained, and supervised Kwiatkowski because those claims do not allege damage that resulted from medical services. Essentially, Exeter and Triage argue that it is the nature of the claim upon which liability is sought to be predicated that controls whether the exclusion applies. Thus, they argue that, for the purposes of the claims against Triage, the alleged bodily injury resulted from negligent employment practices, not the negligent provision of medical services. We disagree.

We previously rejected a similar argument in Preferred National Insurance Co. v. Docusearch, 149 N.H. 759 (2003). In that case, a customer of the insured used information that he obtained from the insured to track down and fatally shoot another person. Preferred Nat'l Ins. Co., 149 N.H. at 761. The administrator of the victim's estate subsequently brought a negligence claim against the insured. Id. at 763. The insured's policy contained an endorsement that excluded coverage for assault and battery. Id. at 761-62. Because the damages alleged against the insured arose entirely out of an assault, which was excluded by the assault and battery endorsement, we held that the negligence claims were excluded. Id. at 763-64; see also State Farm Ins. Co. v. Bruns, 156 N.H. 708, 713 (2008) (reasoning that the scope of a

---

[6] Triage argues that these cases are "not useful precedent" because the separation of insureds provisions in those cases did not appear "in a specifically named 'Separation of Insureds' clause in an endorsement 'modifying' the policy forms." We find this to be a distinction without a difference. A reasonable person in the position of the insured would not expect any substantive difference between the effect of a separation of insureds provision located within a policy and the effect of a separation of insureds provision located within an endorsement modifying the policy.

liability policy's coverage should be determined based upon the policy language and the facts pled in the underlying suit rather than the legal nomenclature that the plaintiff used to frame the suit).

Here, the Exeter Patients brought negligent hiring, employment, training, and supervision claims against Triage. The injury that they alleged — infection with Hepatitis C — resulted from Exeter employees injecting them during the course of their receiving medical treatment with syringes that Kwiatkowski had previously filled with a tainted saline solution. Thus, the Exeter Patients' alleged injury resulted from the provision of medical services, thereby triggering the healthcare professional services exclusion. Put another way, Triage could not be liable for negligent hiring and supervision unless a claimant suffered an injury, and the claimants in this case would not have been injured by Triage's negligent hiring and supervision <u>but for</u> the provision of medical services that caused the Exeter Patients' injuries. Accordingly, because the Exeter Patients' damage arose wholly out of the provision of medical services, the healthcare professional services exclusion excludes coverage under the general liability coverage form for their negligence claims.

Exeter also argues that "[s]hould the Court determine that the Healthcare Professional Services Exclusion bars coverage under the [general liability coverage form], the Court should find coverage for Triage and Exeter under the [professional liability coverage form]." However, Exeter did not preserve this alternative argument. Arch primarily appealed whether specific exclusions in the general liability and umbrella coverage forms barred coverage under those forms. Arch did not appeal the trial court's ruling that the professional liability coverage form did not provide coverage, and neither Exeter nor Triage raised this argument in a cross-appeal. Accordingly, because Exeter's alternative argument is not preserved for our review, we decline to address it. <u>See</u> <u>State v. Blackmer</u>, 149 N.H. 47, 49 (2003) ("An argument that is not raised in a party's notice of appeal is not preserved for appellate review."); <u>Concord Hosp. v. N.H. Medical Malpractice Joint Underwriting Assoc.</u>, 137 N.H. 680, 686 (1993) (declining to review an issue because the party neither filed a cross-appeal nor moved to add the question on appeal); <u>Sup. Ct. R.</u> 7(5) (providing for the filing of a notice of cross-appeal).

B

Arch next argues that the trial court erred by finding that coverage under the umbrella coverage form was not excluded. Arch argues that the umbrella coverage form does not provide broader coverage than the underlying general liability and healthcare professional liability coverage forms. Because we have found that there is no coverage under the general liability coverage form, and because Triage and Exeter did not appeal the trial court's ruling that the healthcare professional liability coverage form provides no coverage, Arch

10

argues that the umbrella coverage form consequently provides no coverage. With regard to Exeter's claim for umbrella coverage, we agree with Arch.

The umbrella coverage form provides that "[a]dditional insured coverage provided by this insurance will not be broader than coverage provided by the 'underlying insurance.'" "Underlying insurance" refers to the general liability and healthcare professional liability coverage forms. Neither party disputes that Exeter is an additional insured under the policies. Because Exeter is an additional insured, if the general liability and healthcare professional liability coverage forms provide no coverage, the umbrella coverage form cannot provide coverage, as any coverage would necessarily be broader than the coverage under the underlying insurance.

As discussed above, coverage for Exeter under the general liability coverage form is barred by the healthcare professional services exclusion. Additionally, because neither Exeter nor Triage appealed the trial court's ruling that the healthcare professional liability coverage form was inapplicable, there is no coverage for Exeter under that coverage form either. Therefore, because the underlying insurance provides no coverage for Exeter, the umbrella coverage form also provides no coverage for Exeter.

With regard to Triage, Arch stated during oral argument that the umbrella coverage form would provide no coverage for Triage if the underlying insurance were found to provide no coverage. In support of this statement, Arch cited the umbrella coverage form's provision that "[a]dditional insured coverage provided by this insurance will not be broader than coverage provided by the 'underlying insurance.'" However, because Triage is a named insured under the underlying insurance, not an additional insured, the provision that Arch cited is inapplicable. Accordingly, subject to the exclusions that Arch argues bar coverage, the umbrella coverage form may still provide coverage for Triage, even though there is no coverage for Triage under the underlying insurance. See, e.g., Coleman Co., Inc. v. California Union Ins. Co., 960 F.2d 1529, 1531 n.1 (10th Cir. 1992) (explaining that umbrella policies may provide broader coverage than underlying policies and that, in such a case, the umbrella policy may "drop down" and become primary).

Arch argues that coverage for Triage under the umbrella coverage form is barred by two exclusions: (1) an "Abuse or Molestation" exclusion; and (2) a "Dishonest, Fraudulent, Malicious, Uninsurable Acts" exclusion.[7] We address each exclusion in turn.

---

[7] Unlike the general liability coverage form, the umbrella coverage form does not contain a healthcare professional services exclusion.

The first exclusion that Arch argues bars coverage is the "Abuse or Molestation" exclusion. That exclusion provides that the umbrella coverage form does not apply to any claim or loss that alleges "[i]njury or damage that is in any way related to, in whole or in part, 'abuse or molestation.'" The umbrella policy defines 'abuse or molestation' as follows: "'Abuse or Molestation' includes but is not limited to any physical, mental, or moral harassment, assault or intimacy of a sexual nature even if consensual."

The parties agree that Kwiatkowski's conduct was not "of a sexual nature." However, the parties dispute whether this exclusion applies only to conduct of a sexual nature, or whether the exclusion also applies to conduct of a non-sexual nature. Triage argues that the phrase "of a sexual nature even if consensual" modifies the words "harassment," "assault," and "intimacy." Thus, under its interpretation, the exclusion cannot apply to conduct of a non-sexual nature, such as Kwiatkowski's conduct. Arch argues that the phrase "of a sexual nature even if consensual" only modifies the word "intimacy." Thus, under Arch's interpretation, non-sexual harassment and non-sexual assault can also trigger the exclusion. Because we find both interpretations reasonable, we construe the exclusion narrowly to permit coverage. See Mellin v. N. Sec. Ins. Co., 167 N.H. 544, 554 (2015) ("When policy language is ambiguous, the language subject to different interpretations is construed in favor of the insured . . . ." (quotation omitted)).

In support of its argument that the abuse or molestation exclusion unambiguously applies to non-sexual conduct, Arch cites multiple cases that have found coverage for non-sexual conduct barred by an abuse or molestation exclusion. See, e.g., Community Action v. American Alliance Ins., 757 A.2d 1074, 1083 (Conn. 2000) ("There is nothing in the language of the [abuse or molestation] exclusion to indicate that the alleged abuse or molestation must be sexually motivated or calculated to arouse the person or persons involved in the offending conduct . . . ."); see also Mount Vernon Fire Ins. Co. v. Hicks, 871 F. Supp. 947, 952 (E.D. Mich. 1994) (insured did not dispute that a non-sexual assault allegation and related claims were covered by an abuse or molestation exclusion); Cincinnati Ins. Co. v. Hall, No. 297600, 2011 WL 2342704, at *3-5 (Mich. Ct. App. June 14, 2011) (ruling that the plain meanings of "abuse," "molestation," and "abuse or molestation," were not limited to sexual abuse or molestation where insurance policy did not define the terms); World Harvest Church v. Grange Mut. Cas. Co., 2013-Ohio-5707, 2013 WL 6843615, at *10-11 (Ohio Ct. App. Dec. 24, 2013) (ruling that an abuse or molestation provision was not limited to sexual abuse or molestation), rev'd on other grounds, 68 N.E.3d 738 (Ohio 2016).

However, none of the insurance policies in those cases provided a definition for "abuse or molestation," let alone the same definition contained in

the umbrella coverage form at issue here. Thus, none of the cases provide any authority for whether the definition of "abuse or molestation" used here is ambiguous regarding whether it applies only to conduct of a sexual nature. See Vaillancourt v. Concord Gen. Mut. Ins. Co., 117 N.H. 48, 50 (1977) (ruling that, when an insurance contract defines a term, the language of that definition controls the meaning of the term).

Arch next argues that "when an exclusion is intended to apply more narrowly — only to conduct of a sexual nature — the exclusion says so." In support of its argument, it cites multiple cases that have differently worded sexual acts exclusions. See, e.g., Nat'l Fire Ins. v. Radiology Associates, 439 F. App'x 293, 295 (5th Cir. 2011) (Exclusion provided: "We will not cover any claims made against you, whether the injury or damage itself was intended or not, which arises out of any sexual act."); St. Paul Fire & Marine Ins. Co. v. Schrum, 149 F.3d 878, 880 (8th Cir. 1998) (Exclusion provided: "Medical Payments to others do not apply to bodily injury . . . arising out of any sexual act, including but not limited to molestation, incest or rape."); Lexington Ins. Co. v. KidsPeace Corp., No. 05-0652, 2006 WL 2456468, at *3 (E.D. Pa. Aug. 22, 2006) (Exclusion provided: "This insurance does not apply to any medical incident, claim, or suit arising out of . . . [a]ny sexual act, including without limitation sexual intimacy (even if consensual), sexual contact, sexual advances, requests for sexual favors, sexual molestation, sexual assault, sexual abuse, sexual harassment, sexual exploitation or other verbal or physical conduct of a sexual nature.").

However, the issue is not whether Arch could have written the abuse or molestation exclusion in a manner that more clearly excluded coverage only for conduct of a sexual nature. Rather, the issue is whether the abuse or molestation exclusion unambiguously applies to conduct that is not sexual in nature. Because the abuse or molestation exclusion can reasonably be read to exclude coverage only for conduct of a sexual nature, we interpret the exclusion in favor of coverage. See Mellin, 167 N.H. at 554.

ii

The final exclusion that Arch argues bars coverage is the "Dishonest, Fraudulent, Malicious, Uninsurable Acts" exclusion (malicious acts exclusion). That exclusion provides that the umbrella coverage form does not apply to any claim or loss that alleges: "'Bodily injury', 'property damage' or 'medical professional injury' arising out of any dishonest, fraudulent or malicious act, including reckless violation of any statute, or any act deemed uninsurable by law, committed by any insured."

13

The trial court found "no dispute that Mr. Kwiatkowski's actions were a 'malicious act.'"[8]  Nevertheless, it ruled that the exclusion was inapplicable because Kwiatkowski was not an "insured" as that term is defined in the policy.  Triage's employees are "insureds" under the Umbrella Policy, "but only for acts within the scope of their employment by [Triage] or while performing duties related to the conduct of [Triage's] business."  The trial court found that Kwiatkowski's acts were not within the scope of his employment.  The trial court reasoned that Kwiatkowski "diverted drugs and replaced them with Hepatitis C," which is not part of his job.  The trial court also reasoned that Triage's business is the provision of temporary staffing — not the provision of tainted blood.

Arch argues that the trial court's analysis was erroneous because it effectively limited its analysis to whether Kwiatkowski's acts were within the "scope of his employment."  Arch contends that the phrase "or while performing duties related to the conduct of [Triage's] business" covers conduct that is broader than that encompassed by the scope of Kwiatkowski's employment.  Arch asserts that Kwiatkowski committed a malicious act <u>while</u> he was performing duties related to the conduct of Triage's business because he diverted drugs at his workplace and at the same time that he was performing his lab technician duties.  Triage argues that Kwiatkowski diverted drugs <u>in lieu</u> of performing his duties.  Triage argues that because the specific act of swapping a fentanyl syringe for a tainted saline syringe was not a duty related to the conduct of Triage's business, Kwiatkowski does not qualify as an "insured" for the purposes of the malicious acts exclusion.

We agree with the trial court and Arch that if the policy language "or while performing duties related to conduct of [Triage's] business" is to be given effect, it must encompass at least some conduct that is not encompassed by the policy language "within the scope of employment."  <u>See</u> <u>Int'l Surplus Lines Ins. Co. v. Mfgs. & Merchants Mut. Ins. Co.</u>, 140 N.H. 15, 19 (1995) ("We will not presume language in a policy to be mere surplus."); <u>see</u> <u>also</u> <u>State Auto. Mut. v. Security Taxicab</u>, 144 F. App'x 513, 518-20 (6th Cir. 2005) (concluding that phrases such as "while performing duties related to the conduct of [the employer's] business" add to and expand upon the phrase "within the scope of

---

[8] In its brief, Arch argues that Kwiatkowski's conduct was malicious — an argument to which Exeter took exception.  However, other than stating that it disagrees with Arch's characterization of Kwiatkowski's conduct as being "malicious" because "[t]here is no evidence that, in engaging in drug diversion activities, Kwiatkowski intended to infect [the Exeter Patients]," Exeter did not: (1) argue that the trial court erred when it found that "[t]here is no dispute that Mr. Kwiatkowski's actions were a 'malicious act'"; (2) brief any argument regarding the meaning of the term "malicious" as it is used in the insurance policies; (3) cite any case law interpreting the term "malicious"; or (4) develop its argument regarding why Kwiatkowski's conduct was not malicious.  Accordingly, Exeter's argument that Kwiatkowski's conduct was not malicious is deemed waived.  <u>See</u> <u>Blackmer</u>, 149 N.H. at 49 (stating that we do not address arguments that "were not sufficiently developed for appellate review").

employment"); Porter v. City of Manchester, 155 N.H. 149, 152 (2007) (An employee's conduct falls within the scope of employment if: "(1) it is of the kind [the employee] is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the employer." (quotation omitted)).

We have not previously interpreted whether an employee's intentional wrongful conduct can occur while performing duties related to conduct of the employer's business. Other courts that have addressed this issue generally agree that an employee's intentional wrongful conduct does not usually fall "within the scope of employment," but they reach varying results regarding whether such conduct falls within broader phrases such as "while performing duties related to the conduct of the employer's business. Compare All American Ins. Co. v. Burns, 971 F.2d 438, 445 (10th Cir. 1992) (ruling that a bus driver who assaulted two girls while transporting them on his employer's bus was an "insured" under employer's policy because his criminal acts "occurred while he was performing the very task he was directed by [his employer] to perform" (emphasis added)), with Selective Ins. Co. v. Oglebay, 242 F. App'x 104, 108 (4th Cir. 2007) (ruling that a driving instructor who assaulted one of his students while he was supposed to be teaching her to drive was not an insured under his employer's insurance because he committed the act "in lieu of performing his duties" and therefore was not performing a duty related to the conduct of his employer's business).

Courts that focus upon whether the specific wrongful act was a duty of employment tend to find employees not to be insureds under their employer's policies. See, e.g., Federal Ins. Co. v. Ward, 166 F. App'x 24, 26, 28-29 (4th Cir. 2006) (employee was in the process of locking up her employer's business after hours when she flicked her cigarette ash into a trash can, thereby causing a fire; court held that the act of flicking the cigarette into trash can after work hours was not a duty related to the conduct of her employer's business or within the scope of her employment); Chestnut Associates v. Assurance Co. of America, 17 F. Supp. 3d 1203, 1207-08, 1212 (M.D. Fla. 2014) (ruling that a pool service employee was not an "insured" under the employer's policy because the employee's wrongful conduct, sexually pleasuring himself in a customer's pool when he was supposed to be servicing the pool, was not the kind of conduct that the employee was hired to perform and thus was neither an act within the scope of his employment nor an act performed while performing duties related to the conduct of the employer's business).

Conversely, courts that focus upon the circumstances surrounding a wrongful act, such as whether the act was performed at the same time that the employee was performing job duties, or was performed at the time and place that an employee was supposed to be performing his duties, tend to find the employee to be an insured. See, e.g., State Auto. Mut., 144 F. App'x at 519-20 (employee who sexually assaulted two women while transporting them in

15

employer's van was performing duties related to the conduct of [his employer's] business, and therefore an insured under his employer's policy, because he only had access to the women as a result of his employment and during the course of his employment); cf. Travelers Indem. Co. v. Bryant, 38 A.3d 1267, 1270 (Me. 2012) (ruling that an employee who was off the clock and returning from a personal camping trip was not acting within the scope of employment or performing duties related to the conduct of his employer's business when he exited his vehicle and assaulted another motorist).

Bearing in mind this divided case law, we determine that Kwiatkowski was an insured within the meaning of the policy exclusion because the harm-causing conduct in which he engaged occurred at the same time as, and incidentally to, the duties he performed that were related to Triage's business. This interpretation gives meaning and effect to the word "while," which means "the time during which an action takes place or a condition exists." Webster's Third New International Dictionary 2604 (unabridged ed. 2002). Furthermore, this interpretation ensures that the phase "while performing duties related to conduct of [Triage's] business" encompasses at least some conduct that is not encompassed by the phrase "within the scope of [his] employment," thereby giving meaning and effect to both phrases and ensuring that neither phrase is rendered superfluous. See Int'l Surplus Lines, 140 N.H. at 19. Thus, for the purpose of determining whether Kwiatkowski was an insured employee under the policy, it does not matter whether the specific act of swapping syringes was a duty related to the conduct of Triage's business so long as Kwiatkowski was also performing such duties. Here, because Kwiatkowski swapped fentanyl syringes for tainted saline syringes while he assisted other medical professionals to prepare for and to carry out invasive procedures, he was an insured under Triage's policies.[9]

Moreover, this interpretation comports with the parties' reasonable expectations. The purpose of the malicious acts exclusion is to exclude coverage for wrongs that one would not expect to fall within the scope of employment or other duties related to the employer's business. Under Triage's and Exeter's interpretation, the exclusion cannot reach these acts because an employee who commits such an act sheds the definition of "insured" for the purposes of that act. Thus, their interpretation would effectively strip the exclusion of any meaningful purpose.

---

[9] That being said, there may be situations in which a person who is performing duties related to his or her employer's business completely abandons those duties and engages in wrongful conduct in lieu of performing the duties. In such a situation, the employee is not engaging in wrongful conduct while performing duties related to his employer's business. See, e.g., Chestnut Associates, 17 F. Supp. 3d at 1212. However, that is not the case here. There is no evidence that Kwiatkowski abandoned all of his job duties while he was diverting fentanyl. Rather, his continued performance of his job duties is precisely what enabled him to simultaneously swap the patients' fentanyl syringes for tainted saline syringes.

Triage next argues that Kwiatkowski was not an insured because his lab technician duties were not duties related to the conduct of Triage's business. Triage asserts that its business is medical staffing, not the provision of health care services. In support of this argument, Triage relies upon an affidavit of its president stating that the company's business is medical staffing, not the provision of health care services. Triage further relies upon a "Business Description" contained within its insurance policies that lists its business as "Medical Registry."

There is no dispute that Kwiatkowski was a Triage employee between April 2011 and October 2011. Pursuant to the Triage-AHSA staffing contract, Exeter paid Triage for the hours worked by Triage employees. Based upon these facts, we cannot agree with Triage that Kwiatkowski was not performing duties related to Triage's business during this period. Kwiatkowski was a Triage employee, performing the duties of his employment, which resulted in income for Triage. Thus, while Kwiatkowski was a Triage employee, his duties at Exeter were related to the conduct of Triage's business.[10]

In October 2011, however, Exeter hired Kwiatkowski. Because Kwiatkowski ceased to be a Triage employee at that time, he was not "performing duties related to the conduct of [Triage's] business," and he was therefore no longer an insured under Triage's insurance policies.

The malicious acts exclusion excludes coverage for Kwiatkowski's acts while he was an insured, but does not bar coverage for Kwiatkowski's acts after he ceased to be a Triage employee. The Exeter Patients allege different infection dates: some allege dates solely within the period Kwiatkowski was a Triage employee, some allege dates solely after that period, and some allege dates both during and after that period. Thus, the applicability of the malicious acts exclusion depends upon when Kwiatkowski took the actions that resulted in the infection of each of the Exeter Patients.

Therefore, for the claims that allege dates of exposure solely outside the period that Kwiatkowski was a Triage employee, Triage is entitled to summary judgment that it is covered under the umbrella coverage form. For the claims that allege dates of exposure solely within that period, the malicious acts

---

[10] Triage additionally argues that there is an issue of material fact regarding whether Kwiatkowski was performing duties related to the conduct of Triage's business when he diverted drugs because there was evidence before the trial court that: (1) Kwiatkowski infected some patients to whom he was not assigned; (2) in some situations he gained access to the operating room when he was not scheduled to be on duty; (3) he assisted other employees by bringing them lead aprons, even though this was not one of his duties. We disagree. There was no evidence, and Triage has not suggested, that Kwiatkowski performed different tasks when he was in the operating room in these situations than the tasks he performed when he was scheduled to be in the operating room. Thus, although working extra shifts and assisting other employees might not have been within the scope of his employment, it was certainly related to the conduct of Triage's business.

exclusion applies, and Arch is entitled to summary judgment that it owes no defense or indemnity to Triage.  However, for the remaining claims, those that allege dates of exposure both during and after the period that Kwiatkowski was a Triage employee, there is a disputed issue of material fact that precludes the grant of summary judgment for either party.[11]

Triage next argues that, notwithstanding our determination that Kwiatkowski was an insured during the period that he was a Triage employee, the separation of insureds clause renders the malicious acts exclusion ambiguous regarding whether it can apply to Triage based upon the conduct of Kwiatkowski.

The separation of insureds clause provides that the umbrella coverage form applies "[s]eparately to each insured against whom 'claim' is made or 'suit' is brought."  The malicious acts exclusion provides that the umbrella coverage form does not apply to any claim or loss that alleges: "'Bodily injury', 'property damage' or 'medical professional injury' arising out of any dishonest, fraudulent or malicious act, including reckless violation of any statute, or any act deemed uninsurable by law, committed by <u>any insured</u>."  (Emphasis added.)  Triage argues that the phrase "any insured" is ambiguous in light of the separation of insureds clause, and, therefore, we must construe the exclusion narrowly in favor of coverage.[12]

However, for a policy to be construed to be ambiguous, it must be susceptible of two <u>reasonable</u> interpretations, one of which affords coverage to the insured.  See <u>Great Am. Dining v. Philadelphia Indem. Ins. Co.</u>, 164 N.H. 612, 616 (2013).  Arch argues that the exclusion bars coverage to Triage based upon the malicious conduct of another insured — Kwiatkowski.  This interpretation gives effect to the plain meaning of "any insured."  Furthermore, as we discussed above, because the separation of insureds clause can still apply to the policies' other exclusions that apply based upon the conduct of "the insured," it is not rendered meaningless simply because it does not apply to the exclusion in question.  See <u>Carbone</u>, 937 F. Supp. at 422-23.  Conversely, Triage argues that the malicious acts exclusion should not apply to Triage based upon the conduct of another insured.  But because Triage's

---

[11] We note that the duty to defend is broader than the duty to indemnify.  <u>See</u> <u>Great Am. Dining v. Philadelphia Indem. Ins. Co.</u>, 164 N.H. 612, 627-28 (2013).  Because the parties do not focus upon the distinction between these duties in their arguments addressed to the exclusion here under consideration, we do not address it either.  On remand, however, the trial court should address whether Arch may be required to defend Triage with respect to claims that span the period before and after Kwiatkowski became an employee of Exeter even though Arch would have a duty to indemnify only for liability imposed upon Triage with respect to Kwiatkowski's actions after he became an employee of Exeter.
[12] As we discussed above, other courts that have dealt with this issue have reached varying conclusions.  <u>Compare</u> <u>Co-operative Ins. Companies</u>, 45 A.3d at 94, <u>with</u> <u>Minkler</u>, 232 P.3d at 614.

18

interpretation renders meaningless the word "any" in the phrase "any insured," it is not a reasonable interpretation. See Weeks v. Co-Operative Ins. Cos., 149 N.H. 174, 178 (2003) (reasoning that an interpretation that contravenes the explicit language of a policy and renders part of the policy meaningless is not reasonable); cf. Carbone, 937 F. Supp. at 423 (reasoning that interpreting the phrase "any insured" as creating joint obligations among insureds, notwithstanding a separation of insureds provision, gives meaning to all of the language, thereby "adher[ing] to the Third Circuit's dictate that a court interpreting an insurance policy should read policy provisions to avoid ambiguities if possible and should not torture the language to create them" (quotation omitted)).

Therefore, because the malicious acts exclusion is subject to only one reasonable interpretation, it is not ambiguous. Accordingly, the malicious acts exclusion bars coverage to Triage for Kwiatkowski's wrongful conduct during the period that Kwiatkowski was an insured.

C

Arch argues that the trial court erred when it determined that Kwiatkowski's conduct constituted multiple occurrences under the Arch general liability coverage forms. Because we have found that the healthcare professional services exclusion precludes coverage to Triage and Exeter under the general liability coverage form, we need not address this argument.

In light of our ruling that the umbrella coverage form provides coverage to Triage for claims that allege dates of exposure after Kwiatkowski ceased to be a Triage employee, we note, however, that the question of how many occurrences is not at issue in the umbrella policy because the coverage for a single occurrence is equal to the form's total coverage.

Furthermore, the trial court ruled that the underlying events triggered coverage under both the 2011 and 2012 policies. Although Arch appealed the trial court's ruling that the umbrella coverage forms provide coverage to Triage, it did not argue that, in the event that we affirm the trial court's ruling that the umbrella coverage forms provide coverage, only one policy year should provide coverage. Accordingly, because Arch did not appeal the trial court's ruling that both the 2011 and 2012 policies provide coverage to Triage for the underlying events, the umbrella coverage forms for both of those years will be applicable up to the full amount of $3 million per policy.

D

Exeter asks us to consider the trial court's ruling regarding Arch's obligation to share Exeter's defense costs equally with Exeter. Exeter argues that Arch should be declared responsible for 100% of Exeter's defense costs.

However, because Exeter did not raise this argument in a cross-appeal, it is not preserved for our review, and we decline to address it.  See Blackmer, 149 N.H. at 49; Concord Hosp., 137 N.H. at 686.

## III

For the reasons stated above, we reverse the trial court's grant of summary judgment in favor of Triage and Exeter regarding Arch's duty to defend and indemnify them pursuant to the general liability coverage forms, reverse the trial court's grant of summary judgment in favor of Exeter regarding Arch's duty to defend and indemnify it pursuant to the umbrella coverage forms, reverse in part and vacate in part the trial court's grant of summary judgment in favor of Triage regarding Arch's duty to defend and indemnify it pursuant to the umbrella coverage forms, and remand to the trial court for further proceedings consistent with this opinion.

Affirmed in part; reversed in part; vacated in part; and remanded.

HICKS and CONBOY, JJ., sat for oral argument but did not participate in the final vote; DALIANIS, C.J., and BASSETT, J., concurred.